IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JOHN GAROFALO, on behalf of himself and all others similarly situated,<br><br>                Plaintiff,<br><br>        v.<br><br>REVLON, INC., RONALD O. PERELMAN, MACANDREWS & FORBES HOLDINGS INC., BARRY F. SCHWARTZ, DAVID L. KENNEDY, ALAN T. ENNIS, ALAN S. BERNIKOW, PAUL J. BOHAN, MEYER FELDBERG, ANN D. JORDAN, DEBRA L. LEE, TAMARA MELLON, KATHI P. SEIFERT and KENNETH L. WOLFE,<br><br>                Defendants. | Civil Action No.<br><br>CLASS ACTION<br><br><br>COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br><br><br><br>JURY TRIAL DEMANDED |

CLASS ACTION COMPLAINT

Plaintiff, John Garofalo, brings this action individually and on behalf of all former Class A common stockholders of Revlon, Inc. ("Revlon" or the "Company") that tendered common stock of the Company pursuant to the Third Amended and Restated Offer to Exchange (the "Exchange Offer") filed with the U.S. Securities & Exchange Commission ("SEC") by Revlon on September 24, 2009 ("Offer Materials"). Plaintiff alleges the following based upon information and belief, except as to those allegations concerning Plaintiff, which are based upon personal knowledge. Plaintiff's information and belief allegations are based upon, among other things: (a) the investigation conducted by and through his attorneys; (b) review and analysis of filings made by Revlon and others with the SEC; (c) review and analysis of press releases, public statements, news articles, security analysts' reports and other publications disseminated by or concerning Revlon; and (d) other public information about Revlon. Most of the facts supporting

the allegations contained herein are known only to defendants or are within their control. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth in this class action complaint ("Complaint") after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal class action is brought on behalf of those persons who tendered their shares into Revlon's September 24, 2009 Exchange Offer, pursuant to which Revlon offered to exchange each outstanding share of its Class A common stock ("Common Stock") for one share of a newly issued series of Revlon Preferred Stock (the "Series A Preferred").  The Exchange Offer was the outgrowth of a proposal by Revlon's controlling stockholders, MacAndrews & Forbes Holdings Inc. ("MacAndrews") and certain of its affiliates, to acquire all of the shares of Revlon's common stock they did not already own.  Following the October 8, 2009 consummation of the Exchange Offer, pursuant to which the members of the Class tendered 9,336,905 shares of Revlon Class A common stock for shares of Series A Preferred, Revlon announced stellar financial results for its quarter ended September 30, 2009 ("Third Quarter 2009"), causing the Company's Common Stock price to rise by over 300%.  Despite the fact that the Exchange Offer closed only a week after the close of Revlon's Third Quarter 2009, its stockholders were not provided with material information about the Company's results possessed by defendants, to which the tendering stockholders were entitled before deciding whether to exchange their Common Stock.  Plaintiff seeks damages on behalf of a class for the losses they suffered as a result of defendants' non-disclosure of material facts and breaches of their fiduciary duties.  Plaintiff is seeking to pursue remedies under §§ 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78 n(a) and t(a) and Rule 14a-9 promulgated thereunder by the SEC, 17 C.F.R. § 240.14a-9, and under Delaware state law.

JURISDICTION AND VENUE

2.      This Court has federal question jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States. This Court also has exclusive jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because plaintiff has brought claims under Sections 14(a) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78n(a) and t(a), and Rule 14a-9 promulgated thereunder by the SEC, 17 C.F.R. § 240.14a-9. This Court also has supplemental jurisdiction over the non-federal claims asserted herein pursuant to 28 U.S.C. § 1367(a).

3.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c), and § 27 of the Exchange Act, 15 U.S.C. § 78aa. Plaintiff may properly sue the Defendants in this District, Revlon's state of incorporation.

4.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

5.      Plaintiff demands a trial by jury for all issues triable of right by a jury.

THE PARTIES

6.      Plaintiff John Garofalo was the owner of 16,849 shares of Revlon Class A Common Stock prior to the Exchange Offer by Revlon. He tendered his Common Stock into the Exchange Offer on October 8, 2009 in reliance on the Offer Materials and in exchange, he received newly issued Series A Preferred of Revlon.

7.     Defendant Revlon is a corporation duly organized and existing under the laws of the State of Delaware with executive offices located at 237 Park Avenue, New York, New York. Through its wholly owned subsidiary, Revlon Consumer Products Corporation ("RCPC"), Revlon engages in the manufacture, marketing, and sale of cosmetics, women's hair color, beauty tools, fragrances, skincare, deodorants, and other personal care products. The Company's common stock trades on the New York Stock Exchange under the ticker symbol "REV." As of December 31, 2008, there were 48,250,163 shares of Revlon Class A Common Stock and 3,125,000 shares of Revlon Class B Common Stock outstanding. As of that date, 28,207,735 shares of Revlon Class A Common Stock were beneficially owned by MacAndrews and its affiliates. All of the shares of Revlon Class B common stock were owned by REV Holdings LLC, a Delaware limited liability company which is an indirectly wholly-owned subsidiary of MacAndrews.

8.     Defendant Ronald O. Perelman ("Perelman") has been Chairman of the Board of Revlon and of RCPC since June 1998 and a Director of the Company and of RCPC since their respective formations in 1992. Perelman has been Chairman of the Board of Directors and CEO of defendant MacAndrews, a diversified holding company, and certain of its affiliates since 1980. Perelman has also been a director of M&F Worldwide Corp. (a holding company owned by MacAndrews) since 1995 and Chairman of the Board of M&F Worldwide Corp. ("M&F Worldwide") from 1995 to 1997 and again from September 2007 to the present. Perelman is also a director of Allied Security Holdings LLC and Scientific Games Corporation (a subsidiary of M&F Worldwide).

9.     Defendant MacAndrews is a corporation duly organized and existing under the laws of Delaware and is located at 35 East 62nd Street, New York, New York. MacAndrews is

wholly owned by defendant Perelman.  Before the Exchange Offer, MacAndrews beneficially held approximately 58.2% of the outstanding shares of Revlon's Class A Common Stock and 100% of Revlon's Class B common stock, thereby controlling 74.6% of the combined voting power of those shares.  Following the Exchange Offer, MacAndrews held approximately 77.5% of Revlon's Class A Common Stock and 100% of Revlon's Class B common stock, representing 78.9% of the combined Class A and Class B common stock, and 77.3% of the combined voting power of the Class A, Class B and Series A Preferred.

10.     Defendant Barry F. Schwartz ("Schwartz") is and was, at all relevant times, a Revlon Director, Executive Vice Chairman and Chief Administrative Officer of MacAndrews and an RCPC Director.

11.     Defendant David L. Kennedy ("Kennedy") is and has been Vice Chairman of the Board of Revlon and RCPC since May 2009.  From September 2006 to May 2009, he was Revlon's President and Chief Executive Officer, and a director of Revlon and MacAndrews since 2006.  From 2002 to 2006, he served as Executive Vice President and President of Revlon's International Operations.

12.     Defendant Alan T. Ennis ("Ennis") is and has been President and Chief Executive Officer of Revlon and RCPC since May 2009, and a director of the Company and RCPC since March 2009.  Until May 2009, he was Revlon's Executive Vice President and Chief Financial Officer and President of Revlon International and previously held other executive positions with Revlon and RCPC since 2005.

13.     Defendant Alan S. Bernikow ("Bernikow") has been a Director of the Company and RCPC since September 2003.

14.     Defendant Paul J. Bohan ("Bohan") has been a Director of the Company since March 2004 and a Director of RCPC since June 2008.

15.     Defendant Meyer Feldberg ("Feldberg") has been a Director of the Company since February 1997.

16.     Defendant Ann D. Jordan ("Jordan") has been a Director of the Company since March 2009.

17.     Defendant Debra L. Lee ("Lee") has been a Director of the Company since January 2006.

18.     Defendant Tamara Mellon ("Mellon") has been a Director of the Company since August 2008.

19.     Defendant Kathi P. Seifert ("Seifert") has been a Director of the Company since January 2006.

20.     Defendant Kenneth L. Wolfe ("Wolfe") has been a Director of the Company since March 2004.

21.     Defendants Perelman and MacAndrews, as controlling stockholders of Revlon, are in a fiduciary relationship with plaintiff and the other public shareholders of Revlon and owe them the highest obligations of loyalty, full and candid disclosure, good faith and fair dealing, and must refrain from abusing their control.

22.     In addition to Perelman, the defendants named in Paragraphs 10 through 20 (collectively the "Individual Defendants") are in a fiduciary relationship with plaintiff and the other public stockholders of Revlon and owe them the highest obligations of loyalty, good faith and fair dealing.

23.     Each of the Individual Defendants, as directors of Revlon, were privy to non-public information concerning the Company's business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Defendants knew or recklessly disregarded the fact that material facts specified herein had not been disclosed in the Offer Materials.

24.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed to investors as alleged herein is the collective product of the narrowly defined group of defendants identified above.  Each of the above directors of Revlon, by virtue of his or her position with the Company, was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. The Individual Defendants were aware, or recklessly disregarded, that the misleading statements were being issued regarding the Exchange Offer, and approved or ratified these statements, in violation of the federal and state securities laws.

25.     As controlling persons of a company, the Individual Defendants each had a duty to disseminate accurate and truthful information promptly with respect to the Exchange Offer and the Company's financial condition and performance, operations, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading, so that the decisions regarding tendering the Company's Common Stock would be based upon truthful and accurate

information.   The Individual Defendants' omissions in connection with the Exchange Offer violated these specific requirements and obligations.

26.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did control the content of the representations to stockholders made by Revlon.

27.     The defendants are liable to those who tendered Revlon's common stock by concealing material positive facts.  The omissions of defendants concealed the intrinsic value of Revlon's Common Stock and caused plaintiff and other Revlon stockholders to tender Common Stock without full information as to material facts which would have substantially altered the total mix of information available to them.  As a result, plaintiff and other Revlon stockholders suffered damages.

## CLASS ACTION ALLEGATIONS

28.     Plaintiff brings this action on his own behalf and as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons who tendered their Revlon Class A Common Stock in the Exchange Offer for shares of Class A Preferred, and their successors in interest, who were injured as a result of defendants' actions, as more fully described herein (the "Class").  Excluded from the Class are defendants, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

29.     This action is properly maintainable as a class action because:

(a)     The Class of stockholders for whose benefit this action is brought is so numerous that joinder of all Class members is impracticable as holders of 9,336,905 shares of

Revlon Common Stock exchanged for Series A Preferred pursuant to the Exchange Offer.  It is reasonable to assume that the Class is geographically dispersed throughout the United States.

(b)     There are questions of law and fact which are common to the Class including, *inter alia*, the following:

(i)     Whether the federal and state securities laws were violated by defendants' acts as alleged herein;

(ii)    Whether defendants omitted stating any material facts in the Exchange Offer;

(iii)   Whether the defendants breached their duty of disclosure by omitting to state material facts that were known to them;

(iv)    Whether plaintiff and the other members of the Class were harmed by defendants' omissions.

(c)     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and has the same interests as the other members of the Class.  Accordingly, plaintiff is an adequate representative of the Class will fairly and adequately protect the interests of the Class.

(d)     Plaintiff anticipates that there will be no difficulty in the management of the action as a class action.

(e)     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class and/or adjudications that would as a practical matter be dispositive of the interests of other members of the Class.

(f)     Defendants have acted on grounds generally applicable to the Class, thereby making appropriate the relief sought with respect to the Class as a whole.

(g)     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. As the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.

<u>SUBSTANTIVE ALLEGATIONS</u>

<u>2008 Reverse Stock Split Revlon Common Stock Price<br>While New Product Initiatives Added to Costs</u>

30.     On April 11, 2008, Revlon issued a press release wherein it announced that the Company's board of directors (the "Board") had approved a reverse split of Revlon's Class A and Class B common stock at a 1-for-10 split ratio.  According to defendant Kennedy, the intent behind the Company's 1-for-10 reverse split was to make the Company "more attractive to a broader range of institutional and other investors," reduce costs, such as listing fees, but most importantly to satisfy compliance with the NYSE's price criteria for continued listing.  Revlon's Class A Common Stock was trading below $1 and had closed at $.96 on April 10, 2008 and was in danger of being delisted by the NYSE if a reverse split was not effectuated or the stock price otherwise increased.

31.     Beginning in the second quarter of 2008, Revlon began to implement a business strategy to build and leverage the Company's brands, particularly the Revlon brand, worldwide. The plan involved introducing a portfolio of new products over the course of three years with attendant levels of advertising, promotion and other manner of brand support.  While reasonably calculated to serve the long-term interests of shareholders over the span of the proposed rolling three-year new products initiative, this business plan would reduce net revenues and earnings in

the shorter term because of increased research and development costs, capital expenditures and advertising and promotional expenditures incurred in connection with the plan, and thereby would not support the stock price in the shorter term.

32.     During the Company's earnings conference calls in 2008, management regularly reported the progress made by the Company in implementing its three-year new products initiative and the attendant brand support.  During an earnings call with investors on July 31, 2008, defendant Kennedy stated, "we continue to make excellent progress on our three year rolling new product portfolio plans ..." and "we intend to support this extensive lineup with competitive levels of brand support throughout the second half of this year."

33.     With the new product costs rising, Revlon focused on trying to lower its cost of debt.  On September 3, 2008, Revlon issued a press release wherein it announced its plans to reduce its debt by $170 million by repaying the $170 million MacAndrews Senior Subordinated Term Loan (the "M&F Term Loan"), which was to mature on August 1, 2009.  According to the press release, the debt reduction was to be achieved in a two-step process.  First, Revlon would use net proceeds of $63 million from a previously announced July 2008 sale of a Brazilian brand to repay $63 million of the $170 million M&F Term Loan.  Second, the Company announced its intent to launch a $107 million equity offering (the "Rights Offering") that would allow Revlon shareholders to purchase additional Revlon Class A Common Stock, and the Company would use the proceeds from the issuance to repay the remaining balance of the M&F Term Loan. Defendant Kennedy commented, "[b]y repaying the M&F Term loan, we will eliminate our highest cost, nearest maturity debt, which carries an annual cash interest cost of almost $19 million.  Improving our capital structure with this important step is consistent with a key aspect of our strategy."

34.     The September 3, 2008 press release also disclosed the Company would effect its previously announced 1-for-10 reverse stock split of its Class A and B common stock.   On September 16, 2008, the Company implemented the 1-for-10 reverse stock split.   After the reverse stock split, Revlon Common Stock initially jumped to as high as $14.00 per share on September 18, 2008.

35.     Again, on a November 5, 2008 earnings call with investors, defendant Kennedy reiterated the Company's progress with the three-year new products initiative, and the expectation of "increased levels of advertising and promotional support in the fourth quarter of 2008 compared to the same period of last year."   On this news, as the market anticipated R&D costs, capital expenditures, and advertising and promotional expenditures would reduce net earnings, Revlon Common Stock plummeted from a November 4, 2008 close of $13.04 per share to a close of $9.61 per share on November 5, 2008.

36.     Subsequently, on November 14, 2008, Revlon issued a press release wherein it announced an amendment to the M&F Term Loan extending the term to the earlier of (a) the consummation of the Rights Offering, or (b) August 1, 2010.   The press release also disclosed that the M&F Term Loan would bear an annual interest rate of 11% payable quarterly in cash. The press release further disclosed that the $63 million already repaid had resulted in an annualized interest savings of approximately $7 million.

37.     Uncertainty in the capital markets in late 2008 delayed the Rights Offering however, although the Company continued to stand by its announced plan to use equity to lower debt into 2009.   Asked about the Rights Offering during a February 12, 2009 fourth quarter 2009 earnings conference call, defendant Kennedy stated:   "The MacAndrews & Forbes loan as you know was extended to August 2010.   *Having said that we're still committed to doing the equity*

*rights offering.*  Obviously, we are watching the markets closely to assess the timing at this point. So our strategy has not changed.  We just have to wait and see what's happened to the marketplace." (emphasis added).

38.     Discussing Revlon's 2008 fourth quarter earnings during the February 12, 2009 earnings conference call, defendant Kennedy continued to focus on the progress of the new product launches and attendant brand support:

> We further strengthened our product offering in the color cosmetics category with the introduction of a comprehensive lineup of Revlon and Almay new products for 2008 and for the first half of 2009.  The product launches included unique offerings for the mass channel innovations, and products, and packaging and line extensions within the Revlon and Almay franchises.  It is important to note that we continue to concentrate on insuring that we have a strong pipeline of new products each and every year in all segments of the mass color cosmetics category.
>
> We supported our new product launches, as well as our existing product lines with effective advertising coupled with integrated promotional activities.  In line with our plan for a more focused allocation of advertising and promotional spending, we supported our brands throughout the year including increased spending in the fourth quarter of 2008 compared to 2007.

39.     Following Revlon's February 12, 2009 announcement of its 2008 fourth quarter and fiscal year financial results, including that fourth quarter profits fell 72%, propelled in substantial part by lower sales in two product lines, the Company's Common Stock price dropped 17% to a 52-week low of $3.75 per share, down from the $14.85 per share it had reached on September 30, 2008.

<u>April 2009 Proposal by MacAndrews and its Affiliates to
Take Company Private Leads to Exchange Offer</u>

40.     By April 2009, the tone of management's statements to the investors changed dramatically and the strategy to complete Rights Offering was superseded by a proposal of MacAndrews and its affiliates to take the Company private.  On April 20, 2009, Revlon issued a

press release wherein it disclosed that its independent directors had received a proposal from MacAndrews pursuant to which all of the Revlon Class A Common Stock not already owned by MacAndrews and its affiliates would be converted into shares of a newly-issued series of voting preferred stock.  This newly-issued voting preferred stock would have an aggregate liquidation preference of $75 million (or approximately $3.74 per share, based upon 20.042 million shares not currently held by MacAndrews).  The preferred stock would pay an annual cash dividend of $12.5%, payable quarterly, and would be redeemed four years from its date of issuance at the liquidation preference, plus accrued and unpaid dividends.

41.     The April 20, 2009 press release disclosed that while MacAndrews had stated in its proposal that it had no present intention to dispose of its equity stake in Revlon, in the event of a sale of the Company within two years of issuance of the preferred stock, the preferred stock would be entitled to participate with the Common Stock to a limited extent, and in the event no such transaction occurs, the holder of each share of preferred stock would be entitled to receive an additional payment of $1.00 per share two years after issuance of the preferred stock.  In connection with the transaction, MacAndrews proposed to contribute to Revlon $75 million toward satisfaction of the M&F Term Loan and to amend the M&F Term Loan to extend its maturity to 2013 and to increase the interest rate on the loan to 12.5%.

42.     Following the April 20, 2009 press release, several lawsuits were filed in Delaware Court of Chancery.  This litigation inhibited management's discussion on the subsequent April 30, 2009 first quarter 2009 earnings conference call.  Abbe Goldstein, a Revlon Senior Vice President of Industrial Relations and Corporate Communications, noted as follows: "As you know, we issued a press release on April 20 announcing that the independent members of our board of directors received a proposal from MacAndrews & Forbes pursuant to which

Revlon would issue new preferred stock in exchange for publicly held class A common stock. *We have no further comment at this time beyond what was in the press release and will not be taking any questions on the subject.  If and when there are developments that require disclosure, we will of course do so."* (emphasis added).

43.     Defendant Kennedy's comments focused on Revlon's financial results for the first quarter ended March 31, 2009 ("First Quarter 2009") in which the Company reported net sales of $303.3 million, operating income of $31.6 million, net income of $12.7 million and free cash flow of $17.5 million for the Company.

44.     In response to questions during the question and answer session, management was noticeably reticent about making any comments on Revlon's future performance.  When asked by Reza Vahabzadeh, an analyst from Barclays Capital, to comment on foreign currency trends in the second quarter of 2009, defendant Kennedy declined to forecast sales in the second quarter or to make any prognostications about momentum going into the second or third quarter directionally.  Mr. Vahabzadeh attempted to rephrase his questions, asking defendant Kennedy: "Do you think that the manufacturing savings that you were able to generate in the first quarter is likely to persist at the same rate in the second quarter?".  Defendant Kennedy responded:  "Well I'll give you the same answer.  We're not going to talk about what we would expect past the first quarter."

45.     Analyst George Calhoob of BTIG similarly tried to focus in on the remainder of the year, asking whether the pipeline of product launches would be more heavily weighted toward the third quarter or the fourth quarter of 2009.  After receiving a generic answer from defendants Kennedy, Mr. Calhoob pressed his question again, asking whether product launches would be more weighted towards the fourth quarter of 2009 than the third quarter, or would it be

equally split.  Defendant Kennedy responded:  "We're not going to call out an answer to that right now."

46.     On May 28, 2009, Revlon announced that it was engaging in an organizational restructuring to "rightsize" the organization in light of economic conditions and their potential effect on the Company's net sales.  It said annualized cost reductions from the restructuring were expected to be approximately $30 million, of which approximately $15 million would benefit 2009 results.  Restructuring and related charges were expected to be $20 million, approximately $17 million of which would be employee-related costs and $3 million would be related to the consolidation of its New Jersey office facilities.  Approximately $17 million of the charges were expected to be recognized in the second quarter of 2009, with the remaining $3 million expected to be recognized in the second half of 2009.  Revlon said all of the charges would be paid over the 2009 to 2012 period, including $11 million in 2009, $6 million in 2010, and the balance of $3 million to be paid thereafter.

47.     Defendant Ennis said, on May 28, 2009, that while the mass color cosmetics category in the U.S. continued to grow, the rate of growth had started to slow, and retailers were carefully examining and optimizing inventory levels.  He observed that first quarter 2009 net sales benefited from higher pipeline shipments of new color cosmetics products, as a result of the timing of shipments and Revlon's more extensive new product lineup, but he anticipated significant negative impact on net sales and profitability in the Company's second quarter 2009 results as compared to the second quarter 2008.

48.     On July 30, 2009, the Company announced its results for the period ended June 30, 2009 ("Second Quarter 2009"), reporting net sales of $376.4 million, net operating

income of $59.4 million, net income of $19.9 million, adjusted EBITDA of $81.7 million and free cash flow of $3 million.

49.     Free cash flow, which Revlon defines as net cash provided by its operating activities, less capital expenditures for property plant and equipment, plus proceeds from the sale of certain assets and excluding proceeds on sale of discontinued operations, is an important barometer of the Company's financial picture.   In its July 30, 2009 earnings announcement, the Company explained that:

> Management uses free cash flow to evaluate its business and financial performance and overall liquidity and in strategic planning.  Management believes that free cash flow is useful for investors because it provides them with an important perspective on the cash available for debt repayment and other strategic measures, after making necessary capital investments in property and equipment to support the Company's ongoing business operations, and provides them with the same measures that management uses as the basis for making resource allocation decisions.

50.     On July 30, 2009, defendant Ennis, Revlon's President and Chief Executive Officer, commented on Revlon's Second Quarter 2009 financial results:

> As part of our business strategy to improve our operating margins and cash flow, on May 28, 2009, we announced an organizational restructuring to reflect the more efficient workflows and processes that we have implemented over the past two years…. We are continuing to execute our established business strategy, which has resulted in our improved financial performance over the past two years and which will, we believe, over time, generate profitable net sales growth and sustainable positive free cash flow.

51.     Defendant Ennis further noted that Revlon was continuing to pursue the business strategy set in late 2006 which focused on leveraging its brands, improving its strategies and organization, strengthening its international business and improving its operating profit margins, cash flow and capital structure.  He said that the Company was pleased with the performance of its new product launches (in keeping with a 3-year plan brand portfolio strategy to focus on drivers of profitable brand growth) which it supported with appropriate levels of advertising and

promotion.  To that end, Revlon introduced a number of new products in the first half of 2009.  But, while the mass color cosmetics category in the U.S. continued to grow, the rate of growth slowed and certain retailers reduced inventory levels.  This, together with the unfavorable effect of foreign currency fluctuations, negatively impacted Revlon's Second Quarter 2009 results.  Defendant Ennis expressed his belief that the continued execution of the Company's business strategy would, "over time, generate profitable net sales growth and sustainable positive free cash flow."

52.    When asked by an analyst about the Company's expectations for the third quarter ended September 30, 2009 ("Third Quarter 2009"), defendant Ennis observed that what Revlon saw in the Second Quarter 2009 differed from the First Quarter 2009 and was "indeed different" from what it saw in the fourth quarter 2008.  In the U.S., the color cosmetics category growth rate slowed from 3 to 4% for a few quarters until the Second Quarter 2009, when it slowed to 1.1%.  In addition, U.S. retailers, and some non-U.S. retailers reduced inventory and there was "continued uncertainty" going forward.  Chris Elshaw, Revlon's Executive Vice President and Chief Operating Officer, said Revlon "continue[s] to work very closely with [retailers] on managing those inventories," indicating that the Company kept abreast of, and was focused on any changes or new developments.

53.    On August 10, 2009, Revlon filed a Tender Offer Statement and 13E-3 Transaction Statement on Schedule TO with the SEC with respect to the commencement of its initial August 10, 2009 exchange offer, the terms of which initially included that each share of Series A Preferred would have a liquidation preference of $3.71 per share and be entitled to receive a 12.75% annual dividend payable quarterly in cash and be mandatorily redeemable after four years.  Another amendment was filed on September 10, 2009.

Exchange Offer and Filing of Offer Materials

54.     On September 24, 2009, Revlon announced that it had further amended certain terms of its previously announced exchange offer such that, *inter alia*, each share of Series A Preferred would have a liquidation preference of $5.21, holders of the Series A Preferred would receive cash payments of approximately $7.87 per share over the four-year term of the Preferred Stock, through the payment of the $5.21 per share liquidation preference at maturity and 12.75% annual dividends payable quarterly in cash, equal to approximately $0.17 per share quarterly. These per share calculations assumed that Revlon would not engage in one of certain specified change of control transactions, which could lead to a higher payment. If Revlon engaged in one of certain specified change of control transactions within three years of consummation of the Exchange Offer, Series A Preferred holders would have the right to receive a special dividend, capped at an amount that would provide aggregate cash payments of up to $12.00 per share (including the liquidation preference and any dividends paid or payable in respect of the Series A Preferred).

55.     MacAndrews represented that, upon consummation of the Exchange Offer, it would contribute to Revlon $5.21 of the aggregate outstanding principal amount of the Term Loan for each share of Common Stock tendered, up to a maximum contribution of approximately $105.43 million toward the aggregate outstanding principal amount of the Senior Subordinated Term Loan.

56.     Revlon said that the amended terms of the Exchange Offer were authorized by Revlon's Board of Directors, including all of the independent members of Revlon's Board of Directors, and are reflected in a revised settlement-in-principle with parties to Delaware Court of

Chancery lawsuits filed against Revlon, its directors and MacAndrews, in connection with MacAndrews' initial acquisition proposal.

57.     The revised terms and conditions of the Exchange Offer are set forth in the Offer Materials, specifically the Third Amended and Restated Offer to Exchange and its annexes, which were filed with the S.E.C. on September 24, 2009 as an exhibit to an Amendment to Revlon's Tender Offer Statement and Schedule 13E-3 Transaction Statement on Schedule TO.

58.     The Offer Materials included the following Summary Projections for year ending December 31, 2009 (in approximately $ millions):

| | |
|---|---|
| Revenues | $1,309 |
| EBITDA | $ 252 |
| Free Cash Flow | $ 70 |

59.     On October 8, 2009, Revlon announced that the Exchange Offer, which expired on October 7, 2009, had been consummated. and that it had issued 9,336,905 shares of Revlon Series A Preferred to stockholders (other than MacAndrews and its affiliates) in exchange for the same number of shares of Revlon Common Stock tendered for exchange.  The Common Stock tendered in the Exchange Offer represented 46% of the shares of Revlon Common Stock not beneficially owned by MacAndrews.

60.     As a result of these transactions: a) MacAndrews beneficially owns 37,544,640 shares of Revlon Class A Common Stock, or 77.5% of the Revlon Class A Common Stock, all 3,125,000 shares of Revlon's Class B common stock and 78.9% of the combined Revlon Class A Common Stock and Class B common stock (representing 77.3% of the combined voting power of the Revlon Class A and Class B common stock and the Series A Preferred); and b) Revlon's stockholders (other than MacAndrews) beneficially own 10,898,432 shares of Revlon Class A Common Stock, or 22.5% of the Revlon Class A Common Stock, and all 9,336,905 shares of the

Revlon Series A Preferred (which, together with the Revlon Class A Common Stock held by such stockholders, represent 22.7% of the combined voting power of the Revlon Class A and Class B common stock and the Series A Preferred).

61.     On October 29, 2009, just 3 weeks after the Exchange Offer closed, Revlon announced that its results for the Third Quarter 2009 and the nine months ended September 30, 2009 had swung to a substantial quarterly profit on a continuing operations basis, while reporting net sales of $326 million.   The Company's Third Quarter 2009 operating income was $50.3 million, nearly twice its $26.6 million operating income for the Second Quarter, and well in excess of the $31.6 million in operating income for the First Quarter 2009.   (Operating income, or operating profit (earnings before deduction of interest payments and income taxes) is a measure of a company's earning power from ongoing operations.   Revlon's net income was $23.1 million for the Third Quarter 2009, as compared with $19.9 million for the previous quarter and $12.7 million in the First Quarter 2009.   Third Quarter 2009 Common Stock earnings of $.45 per share was a dramatic increase over the Company's earnings in the first two quarters of 2009.   For the quarter ended September 30, 2009, free cash flow was $54.1 million, an enormous increase over the $3 million in free cash flow reported in the Second Quarter 2009.

62.     Strikingly, Revlon had now reported free cash flow for only the nine months ended September 30, 2009 of $74.6 million, already in excess of the projected $70 million for the full year ending December 31, 2009 contained in the September 24, 2009 Offer Materials.

63.     Thus, nothing in the Offer Materials or prior statements by the Company or the Defendants prepared the plaintiff and Class Members for the strength of the Third Quarter 2009 results, and the projected information contained in the Offer Materials was misleading.

64.     The strength of these Third Quarter 2009 results were reflected in the Company's increased market share in the U.S.  According to AC Nielsen, Revlon's Third Quarter 2009 market share increased from its Second Quarter 2009 market share in 4 out of 5 categories and the Company retained its top position in the lip segment with a 22.3% share of the category.

65.     When the Company's Third Quarter 2009 financial results were released, the stock market reacted immediately to Revlon's extremely favorable results.  The results were termed "unexpected" in the financial press, and sent Revlon's trading price from its October 28, 2009 $5.75 per share closing price to close at $8.24 per share on October 29, 2009. *TheStreet.com*, for example, said that Revlon's Common Stock price was "soaring" after reporting an "unexpected profit" in the Third Quarter 2009.  Revlon's Common stock price has continued to increase, closing at $18.87 per share on December 17, 2009, a greater than 300% increase from the close of the Exchange Offer.

66.     Market analysts were also not informed by Revlon of its anticipated superior results.  For example, on July 31, 2009, Goldman Sachs (listed on Revlon's website as one of its fixed income analysts and a participant in its quarterly investor conference calls, as is reflected in the conference call transcripts) issued a report that reflected its Third Quarter 2009 estimates of only $22.7 million in operating income, free cash flow of $26.2 million and ($.02) in earnings per share.

67.     Similarly, in her August 3, 2009 research report, Connie Maneaty of BMO Capital Markets, the sole equity analyst covering Revlon's Common Stock, projected that Revlon would have Third Quarter 2009 loss of $.16 per share and set BMO's per share target at $6 per share.  On August 21, 2009, following the announced August 10, 2009 terms of Revlon's exchange offer, Maneaty issued another report in which she said, "we think there is more

downside than upside to estimates" and lowered BMO's target to $5 per share.  On October 2, 2009, the BMO target was increased to $5.42 per share following the September 24, 2009 amendment to the terms of the Exchange Offer.  Defendants were aware of her coverage of Revlon as she was listed on Revlon's website as the sole equity analyst who covers the Company.  BMO associate analyst Patrick Trucchio was among the conference call participants on Revlon's quarterly earnings conferences, including the second quarter 2009 conference call, as is reflected in the call transcripts.

68.     Noting the surprise reported Third Quarter 2009 results by Revlon, BMO's October 29, 2009 "Flash" report is headlined: "3Q of operating EPS of $0.45 Far Exceeded Our Estimate for a Loss of $0.26."  That report indicates that there was a gross-margin expansion versus the contraction BMO had anticipated, and lower selling, general and administrative expenses.  BMO said the sales upside occurred both in the U.S. (given lower than expected inventory control) and internationally.  As a result, the Company generated operating profit of $50.3 million versus the estimated $25.1 million (which would have been slightly lower than the 2009 Second Quarter) and $54.1 million in free cash flow.  As Maneaty said in her November 9, 2009 report "earnings surprised us and we're raising estimates."

69.     Following the Third Quarter 2009 results, Maneaty upgraded the Company's Common Stock on improving financials and lower expenses.  Unsurprisingly, Maneaty said she believed that, in 2009 and 2010, Revlon will top the free cash flow it generated in 2008.  She observed that Revlon has grown its market share in lipstick sales, retaining the No.1 spot with 22.3% of the market.

70.     As the market continued to digest the news about the Company's results, its Common Stock price continued to climb, closing at $ 18.10 per share on November 30, 2009.

71.     The Individual Defendants, given their positions, had access to internal information about Revlon, including its financial results, operations and position in the markets in which it competes.   This material information and the status of its costs and expenses, inventory, sales and margin information and operating cash flow (all items of which the Company's executive officers, directors and MacAndrews were focused in the Third Quarter 2009, particularly in light of the Exchange Offer and were reasonably available to all defendants before the Exchange Offer closed).   However, none of that critical information was provided to Revlon's stockholders before the Exchange Offer closed.   Given the enormous positive change in the Company's Third Quarter 2009 results wholly unanticipated by the market, these expected Third Quarter 2009 results were clearly material to the Revlon stockholders in deciding whether to tender their common stock into the Exchange Offer.   The defendants had a duty to disclose this material information about its true anticipated results which was reasonably available to them.

72.     The disclosures made about the Company in the Exchange Offer documents were thereby inadequate and misleading, thus preventing Revlon's shareholders from making informed decisions regarding the Exchange Offer.

73.     As a result of the Individual Defendants' failure to take such steps, plaintiff and the other members of the Class have been damaged in that they did not receive their proportionate share of the value of the Company's assets and business when they tendered their Common Stock in the Exchange Offer.

## COUNT I

### CLAIM FOR VIOLATIONS OF SECTION 14(a) OF THE EXCHANGE ACT AND RULE 14a-9 PROMULGATED THEREUNDER BASED UPON MATERIAL OMISSIONS IN THE OFFER MATERIALS
(Against Revlon)

74.     Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

75.     For purposes of this claim, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging or sounding in fraud or intentional, knowing or reckless misconduct.  Rather, the conduct alleged herein was negligent or grossly negligent.

76.     This claim is based solely upon the Offer Materials and SEC filings related to or incorporated by reference in the Offer Materials.

77.     Revlon is the issuer of the Offer Materials.

78.     As alleged in detail above, the Offer Materials contained material omissions, specifically the failure to disclose that the Company was beginning to experience real returns on its business plan and was on track to report very favorable results for the Third Quarter 2009.

79.     The omissions in the Offer Materials were material to shareholders in tendering pursuant to the Exchange Offer.  But for the material omissions in the Offer Materials, plaintiff and other members of the Class would not have tendered their Revlon common stock or would have insisted upon better terms of exchange such as substantially greater number of Series A Preferred, greater liquidation preference, higher quarterly dividends, or  higher change of control contingency payments or a cash component to reflect the true value of the Revlon common stock at the time.

80.     The failure to include material facts as to the currently known and anticipated earnings and free cash flow rendered the Offer Materials materially misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9 thereunder.

81.     The Offer Materials were an essential link in the accomplishment of the Exchange Offer.  As a direct and proximate result of the Offer Materials, plaintiff and members of the Class tendered their Common Stock.

82.     Plaintiff and members of the Class were damaged as a direct and proximate result of the material misstatements and omissions in the Offer Materials.

83.     By reason of the foregoing, Revlon violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9.

## COUNT II

### (Against the Individual Defendants and MacAndrews for Violations of § 20(a) of the Exchange Act)

84.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

85.     For purposes of this claim, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging or sounding in fraud or intentional, knowing or reckless misconduct.  Rather, the conduct alleged herein was negligent or grossly negligent.

86.     This claim is based solely upon the Offer Materials and SEC filings related to or incorporated by reference in the Offer Materials.

87.     The Individual Defendants and MacAndrews acted as controlling persons of Revlon within the meaning of § 20(a) of the Exchange Act as alleged herein.  Persons under the Exchange Act includes natural persons and companies such as MacAndrews.  By virtue of their high-level positions as directors and/or officers of the Company, and their participation in and/or

awareness of Revlon financial results, operations and position in the markets in which it competes and/or knowledge of the status of its costs and expenses, inventory, sales and margin information, the Individual Defendants and MacAndrews had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Revlon, including the content and dissemination of the Offer Materials which plaintiff contends contain material omissions.  The Individual Defendants and MacAndrews were provided with or had unlimited access to copies of Revlon's Offer Materials alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

88.    In particular, the Individual Defendants and MacAndrews had direct and/or supervisory involvement in the operations of the Company and, therefore, are presumed to have had the power to control or influence the Offer Materials giving rise to the violations of § 14(a) of the Exchange Act and the Rules promulgated thereunder, as alleged herein, and exercised the same.

89.    As noted above, Revlon violated § 14(a) and Rule 14a-9 by their acts and omissions as alleged in this Complaint.  By virtue of its positions as controlling persons, the Individual Defendants and MacAndrews are liable pursuant to § 20(a) of the Exchange Act.

90.    As a direct and proximate result of the Individual Defendants' and MacAndrews' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their tender of the Company's Common Stock pursuant to the Offer Materials.

## COUNT III

## BREACH OF FIDUCIARY DUTY
**(Against Individual Defendants)**

91.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

92.     This count is brought under the doctrine of supplemental jurisdiction to enforce liability created under Delaware law.

93.     Individual Defendants have violated the fiduciary duties of care, loyalty, and good faith owed under Delaware law to the stockholders of Revlon.

94.     Given the timing of the Exchange Offer (which began just before the close of the Third Quarter 2009 and expired 9 days after the quarter ended), the Individual Defendants breached their fiduciary duties owed to plaintiff and other holders of the Company's Common Stock when they failed to fully and fairly disclose all material information within their control and closed the Exchange Offer without providing Revlon's minority stockholders with material information about the Third Quarter 2009. Given the confluence of a tender offer – an extraordinary transaction – and the end of the quarter, the Individual Defendants were paying close attention to the financial results the Company would be announcing.  Certainly, that information was reasonably available to Individual Defendants by the October 7, 2009 close of the Exchange Offer.

95.     In failing to update the Exchange Offer so that Revlon's minority common stockholders could make a fully informed decision whether to exchange their Common Stock for Class A Preferred, the Individual Defendants failed to exercise the care required and breached their duties of loyalty, good faith and candor.

96.     The Individual Defendants controlled the corporate affairs of Revlon and were in possession of information concerning its assets, business, and future prospects.  There existed an imbalance and disparity of knowledge and information between them and the plaintiff and members of the Class.  Several of the Individual Defendants are not independent and stood to benefit from the non-disclosure of the information by virtue of their affiliation with MacAndrews.  It was inherently a breach of fiduciary duties to allow MacAndrews to consummate the Exchange Offer under these circumstances.

97.     Plaintiff and the Class have suffered irreparable injury because of the Individual Defendants' actions.

98.     Plaintiffs seek rescissory damages.  Without such relief, plaintiff and the other Class members will be excluded from their fair share of Revlon's profits, valuable assets and business.

## COUNT IV

### BREACH OF FIDUCIARY DUTY AND AIDING AND ABETTING
**(Against MacAndrews)**

99.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

100.    MacAndrews had a fiduciary duty as controlling shareholder to the minority shareholders of Revlon such as plaintiff and members of the Class to act with candor. Separately, MacAndrews aided and abetted the Individual Defendants in their breaches of fiduciary duty.  It had access to the Revlon financial information which disclosure was required as material to the mix of information presented to plaintiff and the Class as part of the Exchange Offer.

101.    MacAndrews was aware of the Individual Defendants' failure to disclose the material information identified herein, and therefore had knowledge of the Individual Defendants' duties and their fiduciary breaches.

102.    Given that MacAndrews controlled Revlon and that two of MacAndrews' executives served as Revlon directors, MacAndrews was able to, and did, actively and knowingly encourage and participate in those breaches to obtain the substantial financial benefits that the Exchange Offer provided to it at the expense of Revlon's stockholders.

103.    As with the Individual Defendants, there was an imbalance and disparity of the knowledge and information possessed by MacAndrews by virtue of its position of control of Revlon between it and the plaintiff and members of the Class.  MacAndrews wrongfully sought to take advantage of the disparity and to induce the Class to relinquish their Common Stock in the Company at an unfair price on the basis of incomplete or inadequate information.

WHEREFORE, plaintiff prays for relief and judgment as follows:

A.    Declaring this to be a proper class action and certifying plaintiff as Class representative;

B.    Awarding compensatory damages in favor of plaintiff and the members of the Class against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding rescissory damages to the Class;

D.    Directing that Defendants account to plaintiff and the Class for all damages caused to them and account for all profits and any special benefits obtained by defendants as a result of their unlawful conduct;

E.      Awarding to plaintiff and the Class the costs and disbursements of this action, including a reasonable allowance for the fees and expenses of plaintiff's attorneys and experts; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: December 31, 2009

/s  Robert D. Goldberg, Esq.
ROBERT D. GOLDBERG
Bar I.D. No. 631
BIGGS & BATTAGLIA
921 Orange Street
P.O. Box 1489
Wilmington, DE  19899
Tel.:    (302) 655-9677
Fax:    302) 655-7924
Email:  goldberg@batlaw.com

LAWRENCE DEUTSCH
ROBIN SWITZENBAUM
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA 19103
Tel:     (215) 875-3062
Fax:     (215) 875-4604
Email:  ldeutsch@bm.net
          rswitzenbaum@bm.net

*Counsel for Plaintiff*

# REVLON, INC.
## CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAWS

John A. Garofalo ("Plaintiff"), hereby duly swears and says, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed the draft complaint against Revlon, Inc. and certain of the officers and directors of Revlon, Inc. approves of its contents, and authorizes his selected counsel, Berger & Montague, P.C., to represent him in this action, including filing a complaint and a lead plaintiff petition on his behalf.

2.      Plaintiff did not purchase the security that is the subject of the complaint at the direction of his counsel or in order to participate in this private action.

3.      Plaintiff is willing to serve as representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff's transactions in the security that is the subject of the complaint during the class period alleged in the complaint are as follows:

> **Number of Shares of Common Stock Held on Sept. 24, 2009 and then Converted to Preferred Shares:**
>
> John A. Garofalo IRA VFTC As Custodian (Roth Account):      4,715 shares
> John A. Garofalo as J.T. TEN WROS:      12,134 shares

5.      Plaintiff has not sought to serve or served as a representative party on behalf of a class under the United States federal securities laws during the three (3) years preceding the date on which this certification is signed.

6.      Plaintiff has not accepted and will not accept any payment for serving as representative party on behalf of the class beyond his *pro rata* share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 29 day of December, 2009.

By: _____
John A. Garofalo

GarofaloPSLRACert