IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JOHN GAROFALO, on behalf of himself and all others similarly situated, | Civil Action No.1:09-cv-01008-UNA |
| Plaintiff, | CLASS ACTION |
| v. | COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| REVLON, INC., RONALD O. PERELMAN, MACANDREWS & FORBES HOLDINGS INC., BARRY F. SCHWARTZ, DAVID L. KENNEDY, ALAN T. ENNIS, ALAN S. BERNIKOW, PAUL J. BOHAN, MEYER FELDBERG, ANN D. JORDAN, DEBRA L. LEE, TAMARA MELLON, and KATHI P. SEIFERT, | JURY TRIAL DEMANDED |
| Defendants. | |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff, John Garofalo, brings this action individually and on behalf of all former Class A common stockholders of Revlon, Inc. ("Revlon" or the "Company") that tendered common stock of the Company pursuant to the Third Amended and Restated Offer to Exchange (the "Exchange Offer") filed with the U.S. Securities & Exchange Commission ("SEC") by Revlon on September 25, 2009 ("Offer Materials"). Plaintiff alleges the following based upon information and belief, except as to those allegations concerning Plaintiff, which are based upon personal knowledge. Plaintiff's information and belief allegations are based upon, among other things: (a) the investigation conducted by and through his attorneys; (b) review and analysis of filings made by Revlon and others with the SEC; (c) review and analysis of press releases, public statements, news articles, security analysts' reports and other publications disseminated by or

concerning Revlon; (d) other public information about Revlon; and (e) a review of documents produced during discovery in this litigation up until the date of the filing of this first amended complaint.   Plaintiff believes that additional substantial evidentiary support will exist for the allegations set forth in this first amended class action complaint ("First Amended Complaint") after a reasonable opportunity for additional discovery.

## NATURE OF THE ACTION

1.      This is a federal class action brought on behalf of those persons who tendered their shares into Revlon's September 25, 2009 Exchange Offer, pursuant to which Revlon offered to exchange each outstanding share of its Class A common stock ("Common Stock") for one share of a newly issued series of Revlon Preferred Stock (the "Series A Preferred").

2.      The Exchange Offer was the outgrowth of a proposal by Revlon's controlling stockholders, MacAndrews & Forbes Holdings Inc. ("MacAndrews") and certain of its affiliates, to acquire all of the shares of Revlon's common stock they did not already own.  However, this attempt was rejected by a Special Committee of Revlon's board after the Special Committee's investment advisor, Barclays Capital Inc. ("Barclays") determined that MacAndrews' offer was patently financially unfair to Revlon's unaffiliated shareholders.

3.      Unable to take full control of the Company by force, MacAndrews contrived with Revlon and other members of Revlon's Board unaffiliated with MacAndrews to propose nearly identical terms to those rejected by Barclays as a "voluntary" Exchange Offer pursuant to a Tender Offer filed with the SEC on Form 13-TO.

4.      While misleadingly styled as a neutral and objective document regarding the "voluntary" exchange of common for preferred stock, the Tender Offer was in fact a carefully crafted marketing document that provided shareholders with misleading half-truths about the

financial strength of the Company, its future prospects, and the "fairness" of the Exchange Offer in the face of a dire threat of defaulting on its maturing debt held by MacAndrews.

5.      In reality, Revlon had internal financial information and forecasts that showed that its cost-cutting measures were being highly effective and greatly improving both operating results and cash flow.   At the time of the Exchange Offer, ███████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

███████████

6.      To add insult to injury, at the same time Defendants (defined below) were withholding this material financial information from plaintiff and the Class, they stated that shareholders must determine on their own the value of the consideration offered.  Revlon falsely stated that it had made no determination as to the value of the consideration being offered in exchange for the shares.  In fact, Revlon knew or should have known that the consideration was unfair, based on both Barclays' offer to render an inadequacy opinion on a nearly identical prior proposal and on Revlon's knowledge of greatly improved financial results for the Third Quarter 2009.

7.      Revlon also misled shareholders by initially stating that the Exchange Offer would be subject to a non-waiveable minimum condition requiring the majority of Revlon's unaffiliated shareholders to tender their shares in order for the Exchange Offer to be consummated (the "Minimum Condition").  This non-waiveable Minimum Condition was at first described as a key factor in the Board's determination that the Exchange Offer was fair.  But faced with the prospect of not being able to complete the Exchange Offer as a result of an inadequate number of shares being tendered as the twice-extended deadline approached, Revlon

made an 11th-hour change to the Exchange Offer and waived the non-waiveable Minimum Condition. Nevertheless, the Board still told plaintiff and the Class that the deal was still "fair," though Revlon cravenly chose to make no recommendation as to whether unaffiliated shareholders such as plaintiff and the Class should tender their shares in the Exchange Offer.

8.      Despite these facts, and despite Barclays' rejection of a nearly identical offer as financially unfair, Defendants nevertheless claimed to have given "careful consideration" to the terms of the Exchange Offer and misleadingly described the Exchange Offer as fair to Revlon's unaffiliated shareholders.

9.      On October 8, 2009, based on the false and misleading statements and omissions of material fact contained in the Tender Offer Statement, as amended, Revlon consummated the Exchange Offer, pursuant to which the members of the Class tendered 9,336,905 shares of Revlon Class A common stock for shares of Series A Preferred.

10.     A mere three weeks later, based largely on information Defendants already knew but had not disclosed while in the process of making the Exchange Offer, Revlon announced stellar financial results for its Third Quarter 2009, causing the Company's Common Stock price to rise by over 300%. Revlon's shareholders who had tendered their Common Stock in the misleading Exchange Offer missed out on this rapid and predictable – to Defendants – gain in the stock price.

11.     Plaintiff seeks damages on behalf of a class for the losses they suffered as a result of Defendants' non-disclosure of material facts and breaches of their fiduciary duties, as well as defendant MacAndrews and its control persons' insider trading of Revlon Class A Common Stock. Plaintiff is seeking to pursue remedies under §§ 14(a), 20A and 20(a) of the Securities

Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78 n(a), § 78t-1, and 78t(a) and Rule 14a-9 promulgated thereunder by the SEC, 17 C.F.R. § 240.14a-9, and under Delaware state law.

**JURISDICTION AND VENUE**

12.     This Court has federal question jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States. This Court also has exclusive jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because plaintiff has brought claims under Sections 14(a), 20A, and 20(a) of the Exchange Act, 15 U.S.C. §§ 78n(a), 78t-1, and 78t(a), and Rule 14a-9 promulgated thereunder by the SEC, 17 C.F.R. § 240.14a-9. This Court also has supplemental jurisdiction over the non-federal claims asserted herein pursuant to 28 U.S.C. § 1367(a).

13.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c), and § 27 of the Exchange Act, 15 U.S.C. § 78aa.  Plaintiff may properly sue the Defendants in this District, Revlon's state of incorporation.

14.     In connection with the acts alleged in this First Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

15.     Plaintiff demands a trial by jury for all issues triable of right by a jury.

**THE PARTIES**

16.     Plaintiff John Garofalo was the owner of 16,849 shares of Revlon Class A Common Stock prior to the Exchange Offer by Revlon.  He tendered his Common Stock into the Exchange Offer on October 8, 2009 in reliance on the Offer Materials and in exchange, he received newly issued Series A Preferred of Revlon.

17.    Defendant Revlon is a corporation duly organized and existing under the laws of the State of Delaware with executive offices located at 237 Park Avenue, New York, New York. Through its wholly owned subsidiary, Revlon Consumer Products Corporation ("RCPC"), Revlon engages in the manufacture, marketing, and sale of cosmetics, women's hair color, beauty tools, fragrances, skincare, deodorants, and other personal care products. The Company's common stock trades on the New York Stock Exchange under the ticker symbol "REV." As of December 31, 2008, there were 48,250,163 shares of Revlon Class A Common Stock and 3,125,000 shares of Revlon Class B Common Stock outstanding. As of that date, 28,207,735 shares of Revlon Class A Common Stock were beneficially owned by MacAndrews and its affiliates. All of the shares of Revlon Class B common stock were owned by REV Holdings LLC, a Delaware limited liability company which is an indirectly wholly-owned subsidiary of MacAndrews.

18.    Defendant Ronald O. Perelman ("Perelman") has been Chairman of the Board of Revlon and of RCPC since June 1998 and a Director of the Company and of RCPC since their respective formations in 1992. Perelman has been Chairman of the Board of Directors and CEO of defendant MacAndrews, a diversified holding company, and certain of its affiliates since 1980. Perelman has also been a director of M&F Worldwide Corp. (a holding company owned by MacAndrews) since 1995 and Chairman of the Board of M&F Worldwide Corp. ("M&F Worldwide") from 1995 to 1997 and again from September 2007 to the present. Perelman is also a director of Allied Security Holdings LLC and Scientific Games Corporation (a subsidiary of M&F Worldwide).

19.    Defendant MacAndrews is a corporation duly organized and existing under the laws of Delaware and is located at 35 East 62nd Street, New York, New York. MacAndrews is

wholly owned by defendant Perelman.  Before the Exchange Offer, MacAndrews beneficially held approximately 58.2% of the outstanding shares of Revlon's Class A Common Stock and 100% of Revlon's Class B common stock, thereby controlling 74.6% of the combined voting power of those shares.  Following the Exchange Offer, MacAndrews held approximately 77.5% of Revlon's Class A Common Stock and 100% of Revlon's Class B common stock, representing 78.9% of the combined Class A and Class B common stock, and 77.3% of the combined voting power of the Class A, Class B and Series A Preferred.

20.    Defendant Barry F. Schwartz ("Schwartz") is and was, at all relevant times, a Revlon Director, Executive Vice Chairman and Chief Administrative Officer of MacAndrews and an RCPC Director.

21.    Defendant David L. Kennedy ("Kennedy") is and has been Vice Chairman of the Board of Revlon and RCPC since May 2009.  From September 2006 to May 2009, he was Revlon's President and Chief Executive Officer, and a director of Revlon and MacAndrews since 2006.  From 2002 to 2006, he served as Executive Vice President and President of Revlon's International Operations.

22.    Defendant Alan T. Ennis ("Ennis") is and has been President and Chief Executive Officer of Revlon and RCPC since May 2009, and a director of the Company and RCPC since March 2009.  Until May 2009, he was Revlon's Executive Vice President and Chief Financial Officer and President of Revlon International and previously held other executive positions with Revlon and RCPC since 2005.

23.    Defendant Alan S. Bernikow ("Bernikow") has been a Director of the Company and RCPC since September 2003.

24.     Defendant Paul J. Bohan ("Bohan") has been a Director of the Company since March 2004 and a Director of RCPC since June 2008.

25.     Defendant Meyer Feldberg ("Feldberg") has been a Director of the Company since February 1997.

26.     Defendant Ann D. Jordan ("Jordan") has been a Director of the Company since March 2009.

27.     Defendant Debra L. Lee ("Lee") has been a Director of the Company since January 2006.

28.     Defendant Tamara Mellon ("Mellon") has been a Director of the Company since August 2008.

29.     Defendant Kathi P. Seifert ("Seifert") has been a Director of the Company since January 2006.

30.     Defendants Perelman and MacAndrews, as controlling stockholders of Revlon, are in a fiduciary relationship with plaintiff and the other public shareholders of Revlon and owe them the highest obligations of loyalty, full and candid disclosure, good faith and fair dealing, and must refrain from abusing their control.

31.     In addition to Perelman, the defendants named in Paragraphs 20 through 29 (collectively the "Individual Defendants") are in a fiduciary relationship with plaintiff and the other public stockholders of Revlon and owe them the highest obligations of loyalty, good faith and fair dealing.

32.     Each of the Individual Defendants, as directors of Revlon, were privy to non-public information concerning the Company's business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations with

other corporate officers and employees, attendance at management and/or Board meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Defendants knew or should have known the fact that material facts specified herein had not been disclosed in the Offer Materials.

33.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed to investors as alleged herein is the collective product of the narrowly defined group of defendants identified above. Each of the above directors of Revlon, by virtue of his or her position with the Company, was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. The Individual Defendants knew or should have known that the misleading statements were being issued regarding the Exchange Offer, and approved or ratified these statements, in violation of the federal and state securities laws.

34.    As controlling persons of a company, the Individual Defendants each had a duty to disseminate accurate and truthful information promptly with respect to the Exchange Offer and the Company's financial condition and performance, operations, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading, so that the decisions regarding tendering the Company's Common Stock would be based upon truthful and accurate information. The Individual Defendants' omissions in connection with the Exchange Offer violated these specific requirements and obligations.

35.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did control the content of the representations to stockholders made by Revlon.

36.     The Defendants are liable to those who tendered Revlon's common stock by concealing material positive facts. The omissions of Defendants concealed the intrinsic value of Revlon's Common Stock and caused plaintiff and other Revlon stockholders to tender Common Stock without full information as to material facts which would have substantially altered the total mix of information available to them. As a result, plaintiff and other Revlon stockholders suffered damages.

37.     Defendants Perelman, Schwartz and Kennedy, as directors of MacAndrews, were privy to non-public information concerning the Company's business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof and via reports and other information provided to them in connection therewith. Perelman, Schwartz and Kennedy, because of their positions of control and authority as directors and/or officers of MacAndrews, were able to and did control MacAndrews.

## CLASS ACTION ALLEGATIONS

38.     Plaintiff brings this action on his own behalf and as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons who tendered their Revlon Class A Common Stock in the Exchange Offer for shares of Class A Preferred, and their successors in interest, who were injured as a result of Defendants' actions, as more fully described herein (the "Class"). Excluded from the Class are Defendants, members of their

immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

39.     This action is properly maintainable as a class action because:

(a)     The Class of stockholders for whose benefit this action is brought is so numerous that joinder of all Class members is impracticable as holders of 9,336,905 shares of Revlon Common Stock exchanged for Series A Preferred pursuant to the Exchange Offer. It is reasonable to assume that the Class is geographically dispersed throughout the United States.

(b)     There are questions of law and fact which are common to the Class including, *inter alia*, the following:

(i)     Whether the federal and state securities laws were violated by Defendants' acts as alleged herein;

(ii)     Whether Defendants omitted stating any material facts in the Exchange Offer;

(iii)     Whether the Defendants breached their duty of disclosure by omitting to state material facts that were known to them;

(iv)     Whether MacAndrews engaged in insider trading; and

(v)     Whether plaintiff and the other members of the Class were harmed by Defendants' omissions.

(c)     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and has the same interests as the other members of the Class. Accordingly, plaintiff is an adequate representative of the Class will fairly and adequately protect the interests of the Class.

(d)     Plaintiff anticipates that there will be no difficulty in the management of the action as a class action.

(e)     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class and/or adjudications that would as a practical matter be dispositive of the interests of other members of the Class.

(f)     Defendants have acted on grounds generally applicable to the Class, thereby making appropriate the relief sought with respect to the Class as a whole.

(g)     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. As the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.

**SUBSTANTIVE ALLEGATIONS**

**2008 Reverse Stock Split Raises Revlon Common Stock Price
While New Product Initiatives Added to Costs**

40.     On April 11, 2008, Revlon issued a press release wherein it announced that the Company's board of directors (the "Board") had approved a reverse split of Revlon's Class A and Class B common stock at a 1-for-10 split ratio. According to defendant Kennedy, the intent behind the Company's 1-for-10 reverse split was to make the Company "more attractive to a broader range of institutional and other investors," reduce costs, such as listing fees, but most importantly to satisfy compliance with the NYSE's price criteria for continued listing. Revlon's Class A Common Stock was trading below $1 and had closed at $.96 on April 10, 2008 and was in danger of being delisted by the NYSE if a reverse split was not effectuated or the stock price otherwise increased.

41.     Beginning in the second quarter of 2008, Revlon began to implement a business strategy to build and leverage the Company's brands, particularly the Revlon brand, worldwide. The plan involved introducing a portfolio of new products over the course of three years with attendant levels of advertising, promotion and other manner of brand support.  While reasonably calculated to serve the long-term interests of shareholders over the span of the proposed rolling three-year new products initiative, this business plan would reduce net revenues and earnings in the shorter term because of increased research and development costs, capital expenditures and advertising and promotional expenditures incurred in connection with the plan, and thereby would not support the stock price in the shorter term.

42.     During the Company's earnings conference calls in 2008, management regularly reported the progress made by the Company in implementing its three-year new products initiative and the attendant brand support.  During an earnings call with investors on July 31, 2008, defendant Kennedy stated, "we continue to make excellent progress on our three year rolling new product portfolio plans ..." and "we intend to support this extensive lineup with competitive levels of brand support throughout the second half of this year."

43.     With the new product costs rising, Revlon focused on trying to lower its cost of debt.  On September 3, 2008, Revlon issued a press release wherein it announced its plans to reduce its debt by $170 million by repaying the $170 million MacAndrews Senior Subordinated Term Loan (the "M&F Term Loan"), which was to mature on August 1, 2009.  According to the press release, the debt reduction was to be achieved in a two-step process.  First, Revlon would use net proceeds of $63 million from a previously announced July 2008 sale of a Brazilian brand to repay $63 million of the $170 million M&F Term Loan.  Second, the Company announced its intent to launch a $107 million equity offering (the "Rights Offering") that would allow Revlon

shareholders to purchase additional Revlon Class A Common Stock, and the Company would use the proceeds from the issuance to repay the remaining balance of the M&F Term Loan. Defendant Kennedy commented, "[b]y repaying the M&F Term loan, we will eliminate our highest cost, nearest maturity debt, which carries an annual cash interest cost of almost $19 million. Improving our capital structure with this important step is consistent with a key aspect of our strategy."

44.     The September 3, 2008 press release also disclosed the Company would effect its previously announced 1-for-10 reverse stock split of its Class A and B common stock. On September 16, 2008, the Company implemented the 1-for-10 reverse stock split. After the reverse stock split, Revlon Common Stock initially jumped to as high as $14.00 per share on September 18, 2008.

45.     Again, on a November 5, 2008 earnings call with investors, defendant Kennedy reiterated the Company's progress with the three-year new products initiative, and the expectation of "increased levels of advertising and promotional support in the fourth quarter of 2008 compared to the same period of last year." On this news, as the market anticipated R&D costs, capital expenditures, and advertising and promotional expenditures would reduce net earnings, Revlon Common Stock plummeted from a November 4, 2008 close of $13.04 per share to a close of $9.61 per share on November 5, 2008.

46.     Subsequently, on November 14, 2008, Revlon issued a press release wherein it announced an amendment to the M&F Term Loan extending the term to the earlier of (a) the consummation of the Rights Offering, or (b) August 1, 2010. The press release also disclosed that the M&F Term Loan would bear an annual interest rate of 11% payable quarterly in cash.

The press release further disclosed that the $63 million already repaid had resulted in an annualized interest savings of approximately $7 million.

47.     Uncertainty in the capital markets in late 2008 delayed the Rights Offering, although the Company continued to stand by its announced plan to use equity to lower debt into 2009.  Asked about the Rights Offering during a February 12, 2009 fourth quarter 2009 earnings conference call, defendant Kennedy stated:  "The MacAndrews & Forbes loan as you know was extended to August 2010.  *Having said that we're still committed to doing the equity rights offering.*  Obviously, we are watching the markets closely to assess the timing at this point.  So our strategy has not changed.  We just have to wait and see what's happened to the marketplace." (emphasis added).

48.     Discussing Revlon's 2008 fourth quarter earnings during the February 12, 2009 earnings conference call, defendant Kennedy continued to focus on the progress of the new product launches and attendant brand support:

> We further strengthened our product offering in the color cosmetics category with the introduction of a comprehensive lineup of Revlon and Almay new products for 2008 and for the first half of 2009.  The product launches included unique offerings for the mass channel innovations, and products, and packaging and line extensions within the Revlon and Almay franchises.  It is important to note that we continue to concentrate on insuring that we have a strong pipeline of new products each and every year in all segments of the mass color cosmetics category.
>
> We supported our new product launches, as well as our existing product lines with effective advertising coupled with integrated promotional activities.   In line with our plan for a more focused allocation of advertising and promotional spending, we supported our brands throughout the year including increased spending in the fourth quarter of 2008 compared to 2007.

49.     Following Revlon's February 12, 2009 announcement of its 2008 fourth quarter and fiscal year financial results, including that fourth quarter profits fell 72%, propelled in substantial part by lower sales in two product lines, the Company's Common Stock price

dropped 17% to a 52-week low of $3.75 per share, down from the $14.85 per share it had reached on September 30, 2008.

<u>The April 2009 Proposal by MacAndrews and<br>its Affiliates to Take Revlon Private</u>

50.    By April 2009, the tone of management's statements to the investors changed dramatically and the strategy to complete Rights Offering was superseded by a proposal of MacAndrews and its affiliates to take the Company private.  On April 20, 2009, Revlon issued a press release wherein it disclosed that its independent directors had received a proposal from MacAndrews pursuant to which all of the Revlon Class A Common Stock not already owned by MacAndrews and its affiliates would be converted into shares of a newly-issued series of voting preferred stock.  This newly-issued voting preferred stock would have an aggregate liquidation preference of $75 million (or approximately $3.74 per share, based upon 20.042 million shares not currently held by MacAndrews).  The preferred stock would pay an annual cash dividend of $12.5%, payable quarterly, and would be redeemed four years from its date of issuance at the liquidation preference, plus accrued and unpaid dividends ("April Proposal").

51.    The April 20, 2009 press release disclosed that while MacAndrews had stated in its proposal that it had no present intention to dispose of its equity stake in Revlon, in the event of a sale of the Company within two years of issuance of the preferred stock, the preferred stock would be entitled to participate with the Common Stock to a limited extent, and in the event no such transaction occurs, the holder of each share of preferred stock would be entitled to receive an additional payment of $1.00 per share two years after issuance of the preferred stock.  In connection with the transaction, MacAndrews proposed to contribute to Revlon $75 million toward satisfaction of the M&F Term Loan and to amend the M&F Term Loan to extend its maturity to 2013 and to increase the interest rate on the loan to 12.5%.

- 16 -

52.     Following the April 20, 2009 press release, Revlon began limiting the information it provided to the public that would allow an accurate valuation of the Company going forward. Revlon held its first quarter earnings conference call on April 30, 2009, during which Abbe Goldstein, a Revlon Senior Vice President of Industrial Relations and Corporate Communications, noted as follows:   "As you know, we issued a press release on April 20 announcing that the independent members of our board of directors received a proposal from MacAndrews & Forbes pursuant to which Revlon would issue new preferred stock in exchange for publicly held class A common stock. *We have no further comment at this time beyond what was in the press release and will not be taking any questions on the subject.  If and when there are developments that require disclosure, we will of course do so.*" (emphasis added).

53.     Defendant Kennedy's comments focused on Revlon's financial results for the first quarter ended March 31, 2009 ("First Quarter 2009") in which the Company reported net sales of $303.3 million, operating income of $31.6 million, net income of $12.7 million and free cash flow of $17.5 million for the Company.

54.     In response to questions during the question and answer session, management was noticeably reticent about making any comments on Revlon's future performance.  When asked by Reza Vahabzadeh, an analyst from Barclays Capital, to comment on foreign currency trends in the second quarter of 2009, defendant Kennedy declined to forecast sales in the second quarter or to make any prognostications about momentum going into the second or third quarter directionally.  Mr. Vahabzadeh attempted to rephrase his questions, asking defendant Kennedy: "Do you think that the manufacturing savings that you were able to generate in the first quarter is likely to persist at the same rate in the second quarter?".  Defendant Kennedy responded: "Well

I'll give you the same answer. We're not going to talk about what we would expect past the first quarter."

55.     Analyst George Calhoob of BTIG similarly tried to focus in on the remainder of the year, asking whether the pipeline of product launches would be more heavily weighted toward the third quarter or the fourth quarter of 2009. After receiving a generic answer from defendants Kennedy, Mr. Calhoob pressed his question again, asking whether product launches would be more weighted towards the fourth quarter of 2009 than the third quarter, or would it be equally split. Defendant Kennedy responded: "We're not going to call out an answer to that right now."

### Revlon Forms a Special Committee and Hires Barclays to Evaluate the April Proposal

56.     On April 28, 2009, the independent members of the Board of Directors of Revlon determined that independent directors Alan S. Bernikow, Paul J. Bohan, Debra L. Lee, Kenneth L. Wolfe and Meyer Feldberg would serve on the Special Committee of the Board of Directors of Revlon that would evaluate the April Proposal ("Special Committee").

57.     At a Special Committee meeting on May 5, 2009, the Special Committee determined to engage Barclays Capital Inc. ("Barclays") as its financial advisor, for the purpose of providing financial advisory services to the Special Committee with respect to the April Proposal.

58.     The letter agreement among Barclays, the Special Committee and Revlon in connection with Barclays' engagement, stated that Barclays shall render one or more opinions to the Special Committee with respect to the fairness of the April Proposal from a financial point of view to Revlon's stockholders (other than MacAndrews and its affiliates), only "if requested by the Special Committee."

59.     Based on Barclays' analysis, the April Proposal was unfair under any of a series of financial metrics. For example, the $3.71 liquidation preference was **below** even the **bottom end** of the ranges of Revlon's value identified by Barclays based on a premiums paid analysis, discounted cash flow analysis (including an anticipated organizational restructuring discussed below), and comparable company trading analysis based on 2009 estimated earnings.

60.     On May 28, 2009, after carefully reviewing the April Proposal, Barclays informed the Special Committee that it would not be able to render an opinion that the consideration to be offered to the stockholders of Revlon (other than MacAndrews) in the April Proposal was fair, from a financial point of view, to the stockholders of Revlon. Importantly, Barclays also informed the Special Committee that, if asked, Barclays would be able to render an opinion that, from a financial point of view, the consideration to be offered to the stockholders of Revlon was **inadequate** (the "Inadequacy Opinion").

### Revlon Announces an Organizational Restructuring and Major Cost-Cutting Initiative During the Second Quarter 2009

61.     On the same day, May 28, 2009, Revlon announced that it was engaging in an organizational restructuring to "rightsize" the organization in light of economic conditions and their potential effect on the Company's net sales. It said annualized cost reductions from the restructuring were expected to be approximately $30 million, of which approximately $15 million would benefit 2009 results. Restructuring and related charges were expected to be $20 million, approximately $17 million of which would be employee-related costs and $3 million would be related to the consolidation of its New Jersey office facilities. Approximately $17 million of the charges were expected to be recognized in the second quarter of 2009, with the remaining $3 million expected to be recognized in the second half of 2009. Revlon said all of

the charges would be paid over the 2009 to 2012 period, including $11 million in 2009, $6 million in 2010, and the balance of $3 million to be paid thereafter.

62.     At the same time, Revlon discussed its outlook for second quarter earnings. Defendant Ennis said, on May 28, 2009, that while the mass color cosmetics category in the U.S. continued to grow, the rate of growth had started to slow, and retailers were carefully examining and optimizing inventory levels.  He observed that first quarter 2009 net sales benefited from higher pipeline shipments of new color cosmetics products, as a result of the timing of shipments and Revlon's more extensive new product lineup, but he anticipated significant negative impact on net sales and profitability in the Company's second quarter 2009 results as compared to the second quarter 2008.

63.     On July 30, 2009, the Company announced its results for the period ended June 30, 2009 ("Second Quarter 2009"), reporting net sales of $376.4 million, net operating income of $59.4 million, net income of $19.9 million, adjusted EBITDA of $81.7 million and free cash flow of $3 million.

64.     Free cash flow, which Revlon defines as net cash provided by its operating activities, less capital expenditures for property plant and equipment, plus proceeds from the sale of certain assets and excluding proceeds on sale of discontinued operations, is an important barometer of the Company's financial picture.  In its July 30, 2009 earnings announcement, the Company explained that:

> Management uses free cash flow to evaluate its business and financial performance and overall liquidity and in strategic planning.  Management believes that free cash flow is useful for investors because it provides them with an important perspective on the cash available for debt repayment and other strategic measures, after making necessary capital investments in property and equipment to support the Company's ongoing business operations, and provides them with the same measures that management uses as the basis for making resource allocation decisions.

65.     Defendant Ennis commented on Revlon's Second Quarter 2009 financial results:

> As part of our business strategy to improve our operating margins and cash flow, on May 28, 2009, we announced an organizational restructuring to reflect the more efficient workflows and processes that we have implemented over the past two years.... We are continuing to execute our established business strategy, which has resulted in our improved financial performance over the past two years and which will, we believe, over time, generate profitable net sales growth and sustainable positive free cash flow.

66.     When asked by an analyst about the Company's expectations for the third quarter ended September 30, 2009 ("Third Quarter 2009"), Defendant Ennis observed that what Revlon saw in the Second Quarter 2009 differed from the First Quarter 2009 and was "indeed different" from what it saw in the fourth quarter 2008. In the U.S., the color cosmetics category growth rate slowed from 3 to 4% for a few quarters until the Second Quarter 2009, when it slowed to 1.1%. In addition, U.S. retailers, and some non-U.S. retailers reduced inventory and there was "continued uncertainty" going forward. Chris Elshaw, Revlon's Executive Vice President and Chief Operating Officer, said Revlon "continue[s] to work very closely with [retailers] on managing those inventories," indicating that the Company kept abreast of, and was focused on any changes or new developments.

67.     **At the time of the Second Quarter conference call,** ██████████████

██████████████████████████████████████████████

██████████ For example, the three analysts who provided earnings estimates for the Third Quarter of 2009 had average EBITDA estimates of $41.4 million. ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

### MacAndrews Proposes a Voluntary Exchange on the
### Same Terms as the Rejected April Proposal

68.     The reason Revlon's positive earnings outlook was not disclosed to analysts or the public was that MacAndrews was still trying to obtain as many Revlon shares as possible despite the inadequate consideration offered in the April Proposal.  Beginning in June of 2009, almost immediately after the Special Committee was forced to reject the April Proposal because Barclays determined the consideration offered to be inadequate and financially unfair, MacAndrews approached Revlon's Board with a proposal for a "voluntary exchange" on terms that were nearly identical to the April Proposal.  The only change was an increase in the dividend on the Preferred Stock from 12.50% to 12.75%,

69.     Despite the fact that the consideration being offered in the Exchange Offer was nearly identical to the consideration deemed inadequate by Barclays in advising the Special Committee, on July 29, 2009, the Independent Directors of Revlon's full Board nevertheless authorized Revlon to conduct the Exchange Offer.

70.     ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

71.     Just a few days later, on August 10, 2009, Revlon filed a Tender Offer Statement and 13E-3 Transaction Statement on Schedule TO with the SEC detailing the terms of the Exchange Offer.

72.     Beginning with the original Tender Offer Statement, the Offer Materials contained a series of half-truths, misleading statements, and omissions designed to give shareholders the impression that the Company was in dire need of completing the Exchange Offer (or it would default on its maturing debt held by MacAndrews), that the future prospects for the Company were dim, and that the Exchange Offer was "fair" to Revlon's unaffiliated stockholders.

73.     For example, in discussing the factors behind the Board's determination that the Exchange Offer was fair to unaffiliated stockholders, the original Tender Offer Statement cited "the independent directors' knowledge of our business, assets, financial condition and results of operations, both on a historical and **on a prospective basis**, and our prospects if we were unable to repay the Senior Subordinated Term Loan when it matures." (emphasis added). Despite this claim, it appears that absolutely no consideration was given by Revlon's Board to ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮

74.     The Offer Materials also included the following Summary Projections for year ending December 31, 2009 (in approximately $ millions):

| | |
|---|---|
| Revenues | $1,309 |
| EBITDA | $ 252 |
| Free Cash Flow | $ 70 |

At the time this projection was included in the Tender Offer Statement, ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

75.     In describing the background of the Exchange Offer, Revlon curiously included the misleading statement that on June 4, 2009, Barclays met with Revlon management to discuss

Revlon's "operating performance to date and the sources of the anticipated earnings shortfall in Revlon's second quarter 2009 quarterly earnings versus the second quarter of 2008, and the factors contributing to such shortfall, as described above." But this statement had nothing to do with the Exchange Offer or Barclays determination that the April Proposal – whose financial terms were nearly identical to the Exchange Offer – was patently unfair from a financial point of view. Instead, the statement was designed to give the impression that Revlon's earnings were and would continue to be soft. In reality, as described above, Revlon was already in possession of information that operating income and cash flow would be significantly higher than expected for both the third and fourth quarters of 2009.

76.     Revlon also noted that one of the risks of participating in the Exchange Offer was the inability to participate in any upside in the value of the Company's Common Stock in the event of a "general economic recovery." Once again, no mention was made of ███████████ ████████████████████████████████████████.

77.     Revlon also sought to market the Exchange Offer as "fair" by highlighting the fact that its largest unaffiliated shareholder, Fidelity, "would view the Exchange Offer as an attractive potential investment opportunity, provided it meets the investment needs of Fidelity and its funds and accounts." This statement was designed to give the misleading impression that Fidelity supported the Exchange Offer.

78.     Revlon further stated in the initial Tender Offer Statement that the Exchange Offer was "fair" because it was "voluntary." In conjunction with this statement, Revlon noted that the Exchange Offer was "procedurally fair" due to various factors, including, in particular, because the Offer was subject to a Non-Waiveable Minimum Condition requiring that a majority

of the Company's unaffiliated shareholders tender their shares in order for the Exchange Offer to be consummated.

79.     Revlon concluded by stating that the positive factors of the Exchange Offer outweighed the negative factors.

### Revlon Extends, Amends, and Modifies the Exchange Offer in Order to Ensure Its Acceptance by Misinformed Shareholders

80.     Despite the attempt to market and sell the Exchange Offer as "fair" in the initial Tender Offer Statement, fewer than the required majority of Revlon's unaffiliated shareholders tendered their shares in response to the offer.  At the same time, the SEC questioned Revlon regarding Revlon's determination that the Exchange Offer was fair.

81.     On August 21, 2009, the SEC issued a letter to Revlon reviewing Revlon's Schedule 13E-3 TO-I filed on August 10, 2009 ("Comment Letter").  In paragraph 28 of the SEC's Comment Letter, the SEC asked Revlon to "disclose all of the reasons why the Special Committee determined not to retain a financial advisor to opine on the fairness of the transaction. . . [and] disclose whether, in making the determination not to obtain a fairness opinion, the Special Committee considered the difficulty of obtaining a fairness opinion, given Barclays Capital's stated inability to deliver one."

82.     Revlon responded to the SEC Comment Letter in a letter dated August 27, 2009 ("Response Letter").  In Revlon's Response Letter, it responded to paragraph 28 by stating it would revise the disclosure to include the following:

> The Independent Directors did not believe that a fairness opinion was necessary for their evaluation of the Exchange Offer because they had determined that, due to the voluntary nature of the Exchange Offer, **they would only focus on the procedural fairness** of the Exchange Offer to Revlon's unaffiliated stockholders and not make a determination as to the substantive fairness of the Exchange Offer. Furthermore, in light of Barclays Capital's inability to deliver a fairness opinion with respect to the April 13 proposal, together with the fact that the shares of

preferred stock proposed to be issued in the exchange offer had substantially similar financial characteristics as those proposed to be issued under the April 13 proposal, the Independent Directors believed that they would not be able to obtain a fairness opinion with respect to the Exchange Offer, though the Independent Directors did not believe that such fairness opinion was necessary for their evaluation of the Exchange Offer. Accordingly, the Independent Directors determined not to retain a financial advisor in connection with the Exchange Offer. (emphasis added)

83.    Consistent with this focus on "procedural fairness," Revlon disclosed in amended filings that the Board had not evaluated the substantive fairness of the Exchange Offer:

> Our Board of Directors did not evaluate the substantive fairness of the Exchange Offer to Revlon's unaffiliated stockholders because of the entirely voluntary nature of the Exchange Offer and because of the protections afforded to Revlon's unaffiliated stockholders who choose not to tender their shares of Class A Common Stock in the Exchange Offer, as described in the section entitled "The Contribution and Stockholder Agreement." […] For these same reasons, our Board of Directors did not retain Barclays Capital or any other unaffiliated representative (as that term is used in Rule 13e-3 of the Exchange Act) to act solely on behalf of Revlon's unaffiliated stockholders for purposes of preparing a report concerning the fairness of the Exchange Offer.

84.    The SEC took serious issue with Revlon's attempt to offer a qualified fairness opinion in connection with the Exchange Offer, writing in a follow up letter:

> Disclosure . . . indicates that the Revlon board of directors did not evaluate the substantive fairness of the Exchange Offer. Item 1014(a) of Regulation M-A requires disclosure of the subject company's reasonable belief as to the fairness of the transaction to unaffiliated security holders. Please provide us with a brief analysis explaining the legal basis upon which Revlon relied to issue a qualified fairness determination.

85.    Faced with this challenge, Revlon revised the language in the Tender Offer once again, removing references to procedural or substantive fairness and stating:

> After careful consideration, our Board of Directors, with Messrs. Perelman, Schwartz, Kennedy and Ennis not participating, has determined that the Exchange Offer is fair to Revlon and Revlon's unaffiliated stockholders who tender their shares for exchange, as well as the unaffiliated stockholders who do not tender their

shares. The Board has also determined not to make any recommendation to unaffiliated stockholders as to whether or not to tender their shares for exchange in the Exchange Offer, and has not made any specific determination as to the value of the consideration to be received by tendering stockholders. Accordingly, you must make your own decision as to whether to tender Class A Common Stock in the Exchange Offer in light of your own particular circumstances, taking into account your determination as to the value of the consideration to be received

\*\*\*

The Board has not made any specific determination as to the value of the consideration to be received by tendering stockholders, and, accordingly, the value of the consideration was not a factor in the Board's reaching its determination that the Exchange Offer is fair to Revlon and Revlon's unaffiliated stockholders who tender their shares for exchange, as well as the unaffiliated stockholders who do not tender their shares. In that regard, the Board did not believe that it was legally required to consider the value of the consideration to be received by tendering stockholders in order to make such determination

86.     The SEC also requested in its August Comment Letter in paragraph 46 that Revlon "clearly disclose why Barclays Capital was unable to provide a fairness opinion in connection with this transaction." In response to paragraph 46 of the SEC Comment letter asking Revlon to disclose why Barclays was unable to provide a fairness opinion, Revlon responded:

As disclosed in the section of the Offer to Exchange titled "Special Factors-Preliminary Draft Report of Special Committee's Financial Advisor-Role of Barclays Capital," beginning on page 48, "Barclays Capital was not retained to advise, and did not advise the Special Committee or the Revlon Board of Directors in connection with the Exchange Offer." As such, Barclays Capital was not asked to provide a fairness opinion in connection with the Exchange Offer, and therefore did not do so.

87.     Upon reading Revlon's response to paragraph 46 of the SEC Comment Letter as set forth in the paragraph above, a representative from Barclays stated: "That's a joke."

88.     The SEC recognized Revlon's disingenuous attempt to avoid the question posed in paragraph 46 of its initial Comment Letter:

> We note your response to comment 46 of our prior letter.  Disclose why Barclays Capital was unable to provide a fairness position **with respect to the April 13 proposal**.  Your disclosure indicates that the terms of the Exchange Offer are substantially similar to those of the April 13 proposal (emphasis added).

89.     Revlon's response was again evasive and disingenuous, stating that Barclays' analysis was not based on any specific analysis or factor but rather "qualitative judgments" as to all the analyses and factors as a whole.  **At no time did Revlon disclose to the SEC or to shareholders that, in fact, Barclays had offered to issue an Inadequacy Opinion**.

90.     On September 24, 2009, Revlon announced that it had further amended certain terms of its previously announced exchange offer such that, *inter alia*, each share of Series A Preferred would have a liquidation preference of $5.21, holders of the Series A Preferred would receive cash payments of approximately $7.87 per share over the four-year term of the Preferred Stock, through the payment of the $5.21 per share liquidation preference at maturity and 12.75% annual dividends payable quarterly in cash, equal to approximately $0.17 per share quarterly.  These per share calculations assumed that Revlon would not engage in one of certain specified change of control transactions, which could lead to a higher payment.  If Revlon engaged in one of certain specified change of control transactions within three years of consummation of the Exchange Offer, Series A Preferred holders would have the right to receive a special dividend, capped at an amount that would provide aggregate cash payments of up to $12.00 per share (including the liquidation preference and any dividends paid or payable in respect of the Series A Preferred).

91.     MacAndrews represented that, upon consummation of the Exchange Offer, it would contribute to Revlon $5.21 of the aggregate outstanding principal amount of the Term

Loan for each share of Common Stock tendered, up to a maximum contribution of approximately $105.43 million toward the aggregate outstanding principal amount of the Senior Subordinated Term Loan.

92.     Revlon said that the amended terms of the Exchange Offer were authorized by Revlon's Board of Directors, including all of the independent members of Revlon's Board of Directors, and were reflected in a revised settlement-in-principle with parties to Delaware Court of Chancery lawsuits filed against Revlon, its directors and MacAndrews, in connection with MacAndrews' initial acquisition proposal.

93.     The revised terms and conditions of the Exchange Offer are set forth in the Third Amended and Restated Offer to Exchange and its annexes, which were filed with the SEC on September 25, 2009 as an exhibit to an Amendment to Revlon's Tender Offer Statement and Schedule 13E-3 Transaction Statement on Schedule TO.

94.     The September 25, 2009, amendments were yet another example of misdirection by Revlon as it desperately tried to help MacAndrews promote the Exchange Offer.  Revlon reported that the consideration to be paid for each tendered share would be raised from $3.71 to $5.21, an apparent forty percent (40%) increase.  In reality, however, MacAndrews merely changed the timing of the $1.50 special dividend for no change in control from two years after the Exchange Offer to the present.  This and the other cosmetic changes made to the Exchange Offer made superficial "improvements" to the Exchange Offer in order to obtain full releases from Delaware Plaintiffs' Counsel.

95.     The Third Amended and Restated Offer of Exchange contained numerous materially false and misleading statements, including: (a) that the Exchange Offer was fair; (b) that the Board had given "careful consideration" to the Exchange Offer; (c) that the Board

had not made any specific determination as to the value of the consideration to be received by tendering shareholders; (d) that the value of the consideration to be received by tendering shareholders was not a factor in the Board's determination that the Exchange Offer was fair; and (e) that the Exchange Offer was necessary in order for Revlon to refinance its MacAndrews' owned debt and avoid potential default.  In addition, the Third Amended and Restated Offer to Exchange failed to disclose material information regarding the known earnings trend and anticipated and actual earnings results that were far better than those anticipated by shareholders and the market.  Further, having chosen to disclose earnings estimates in the Offer Materials, Revlon had a duty to either update or withdraw the estimates as information and trends changed.  Finally, Defendants failed to disclose the material fact that Barclays had offered to render an inadequacy opinion.

96.     On October 8, 2009, Revlon announced that the Exchange Offer, which expired on October 7, 2009, had been consummated. and that it had issued 9,336,905 shares of Revlon Series A Preferred to public stockholders in exchange for the same number of shares of Revlon Common Stock tendered for exchange.  The Common Stock tendered in the Exchange Offer represented 46% of the shares of Revlon Common Stock not beneficially owned by MacAndrews.

97.     As a result of these transactions, MacAndrews beneficially owned 37,544,640 shares of Revlon Class A Common Stock, or 77.5% of the Revlon Class A Common Stock, all 3,125,000 shares of Revlon's Class B common stock and 78.9% of the combined Revlon Class A Common Stock and Class B common stock, representing 77.3% of the combined voting power of the Revlon Class A and Class B common stock and the Series A Preferred.  Revlon's public stockholders (other than MacAndrews) beneficially owned 10,898,432 shares of Revlon Class A

Common Stock (22.5% of the Revlon Class A Common Stock) and all 9,336,905 shares of the Revlon Series A Preferred.  In sum, the combined voting power of the Revlon Class A and Class B common stock and the Series A Preferred was 22.7%.

### Revlon Announces Outstanding Third Quarter Earnings Just Three Weeks After Completing the Exchange Offer

98.     On October 29, 2009, just three weeks after the Exchange Offer closed, Revlon surprised investors and analysts alike by announcing that its results for the Third Quarter 2009 and the nine months ended September 30, 2009 had swung to a substantial quarterly profit for its continuing operations, while reporting net sales of $326 million.  The Company's Third Quarter 2009 operating income was $50.3 million, nearly twice its $26.6 million operating income for the Second Quarter, and well in excess of the $31.6 million in operating income for the First Quarter 2009.  Operating income (earnings before deduction of interest payments and income taxes) is a measure of a company's earning power from ongoing operations.

99.     Similarly, Revlon reported surprisingly strong results for its other key metrics. Revlon's net income was $23.1 million for the Third Quarter 2009, as compared with $19.9 million for the previous quarter and $12.7 million in the First Quarter 2009.  Third Quarter 2009 Common Stock earnings of $.45 per share was a dramatic increase over the Company's earnings in the first two quarters of 2009.  For the quarter ended September 30, 2009, free cash flow was $54.1 million, an enormous increase over the $3 million in free cash flow reported in the Second Quarter 2009.

100.     Strikingly, with the October 29, 2009, announcement Revlon had now reported free cash flow for the nine months ended September 30, 2009 of $74.6 million, already exceeding the projected $70 million for the full year ending December 31, 2009 contained in the September 24, 2009 Offer Materials.

101.   Nothing in the Offer Materials or prior statements by the Company or the Defendants prepared the plaintiff and Class Members for the strength of the Third Quarter 2009 results.  Rather, the far weaker projected information contained in the Offer Materials and the omission of material information regarding the known positive earnings trend had been misleading.

102.   The stock market reacted immediately to Revlon's extremely favorable results. The results were termed "unexpected" in the financial press, and sent Revlon's trading price from its October 28, 2009 $5.75 per share closing price to close at $8.24 per share on October 29, 2009.  *TheStreet.com*, for example, said that Revlon's Common Stock price was "soaring" after reporting an "unexpected profit" in the Third Quarter 2009.  Revlon's Common stock price continued to increase, closing at $18.87 per share on December 17, 2009, a greater than 300% increase from the close of the Exchange Offer.

103.   Market analysts were also not forewarned by Revlon of its anticipated superior results.  For example, on July 31, 2009, Goldman Sachs (listed on Revlon's website as one of its fixed income analysts and a participant in its quarterly investor conference calls, as is reflected in Revlon's conference call transcripts) issued a report that reflected its Third Quarter 2009 estimates of only $22.7 million in operating income, free cash flow of $26.2 million and ($.02) in earnings per share.  These contrasted sharply with Revlon's reported Third Quarter 2009 results of $23.1 million, $54.1 million, and $0.45, respectively.

104.   Similarly, in her August 3, 2009 research report, Connie Maneaty of BMO Capital Markets, the sole equity analyst covering Revlon's Common Stock, projected that Revlon would have Third Quarter 2009 loss of $.16 per share and set BMO's per share target at $6 per share.  On August 21, 2009, following the announced August 10, 2009 terms of Revlon's

exchange offer, Maneaty issued another report in which she said, "we think there is more downside than upside to estimates" and lowered BMO's target to $5 per share. On October 2, 2009, the BMO target was increased to $5.42 per share following the September 24, 2009 amendment to the terms of the Exchange Offer. Defendants were aware of her coverage of Revlon as she was listed on Revlon's website as the sole equity analyst who covers the Company. BMO associate analyst Patrick Trucchio was among the conference call participants on Revlon's quarterly earnings conferences, including the second quarter 2009 conference call, as is reflected in Revlon's conference call transcripts.

105.   Noting the surprise reported Third Quarter 2009 results by Revlon, BMO's October 29, 2009 "Flash" report is headlined: "3Q of operating EPS of $0.45 Far Exceeded Our Estimate for a Loss of $0.16." BMO's report indicates that there was a gross-margin expansion versus the contraction BMO had anticipated, and lower selling, general and administrative expenses. BMO said the sales upside occurred both in the U.S. and internationally. As a result, the Company generated operating profit of $50.3 million versus the estimated $25.1 million (which would have been slightly lower than the 2009 Second Quarter) and $54.1 million in free cash flow. As Maneaty summarized in her November 9, 2009 report "earnings surprised us and we're raising estimates."

106.   Following the Third Quarter 2009 results, Maneaty upgraded the Company's Common Stock on improving financials and lower expenses. Maneaty further upgraded her view of Revlon, stating she believed that, in 2009 and 2010, Revlon would top the free cash flow it generated in 2008. She observed that Revlon has grown its market share in lipstick sales, retaining the No.1 spot with 22.3% of the market.

107.     As the market continued to digest the news about the Company's surprising and outstanding results, its Common Stock price continued to climb, closing at $ 18.10 per share on November 30, 2009.

108.     The Individual Defendants, given their positions, had access to internal information about Revlon, including its financial results, operations and position in the markets in which it competes.  ██████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████ This material information and the status of Revlon's costs and expenses, inventory, sales and margin information and operating cash flow were all items which the Company's executive officers, directors and MacAndrews were focused on in the Third Quarter 2009, particularly in light of the Exchange Offer and were available to Defendants before the Exchange Offer closed.  However, none of that critical information was provided to Revlon's stockholders before the Exchange Offer closed.

109.     Given the enormous positive change in the direction of the Company's results, wholly unanticipated by the market, the Third Quarter 2009 results were clearly material to the Revlon stockholders in deciding whether to tender their common stock into the Exchange Offer. The defendants had a duty to disclose this material information about its true anticipated results which was available to them.

110.     The Defendants also misrepresented, in their correspondence with the SEC and Offer Materials, the material fact that Barclays offered to render an Inadequacy Opinion.

111.     The disclosures made about the Company in the Exchange Offer documents were thereby inadequate and misleading, thus preventing Revlon's shareholders from making informed decisions regarding the Exchange Offer.

112.    As a result of the Individual Defendants' failure to properly make full disclosure of Revlon's current financial condition, its anticipated results, and the financial unfairness of the Exchange Offer in light of those anticipated results, plaintiff and the other members of the Class have been damaged in that they did not receive their proportionate share of the value of the Company's assets and business when they tendered their Common Stock in the Exchange Offer.

<u>COUNT I</u>

**CLAIM FOR VIOLATIONS OF SECTION 14(a) OF THE EXCHANGE ACT
AND RULE 14a-9 PROMULGATED THEREUNDER BASED UPON
<u>MATERIAL OMISSIONS IN THE OFFER MATERIALS</u>**
**(Against Revlon)**

113.    Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

114.    For purposes of this claim, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging or sounding in fraud or intentional, knowing or reckless misconduct.  Rather, the conduct alleged herein was negligent or grossly negligent.

115.    This claim is based solely upon the Offer Materials and SEC filings related to or incorporated by reference in the Offer Materials.

116.    Revlon is the issuer of the Offer Materials.

117.    As alleged in detail above, the Offer Materials contained material omissions, specifically the failure to disclose that the Company was beginning to experience real returns on its business plan and was on track to report very favorable results for the Third Quarter 2009.

118.    The omissions in the Offer Materials were material to shareholders in tendering pursuant to the Exchange Offer.  But for the material omissions in the Offer Materials, plaintiff and other members of the Class would not have tendered their Revlon common stock or would have insisted upon better terms of exchange such as substantially greater number of Series A

Preferred, greater liquidation preference, higher quarterly dividends, or higher change of control contingency payments or a cash component to reflect the true value of the Revlon common stock at the time.

119.    The failure to include material facts as to the currently known and anticipated earnings and free cash flow rendered the Offer Materials materially misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9 thereunder.

120.    The Offer Materials were an essential link in the accomplishment of the Exchange Offer. As a direct and proximate result of the Offer Materials, plaintiff and members of the Class tendered their Common Stock.

121.    Plaintiff and members of the Class were damaged as a direct and proximate result of the material misstatements and omissions in the Offer Materials.

122.    By reason of the foregoing, Revlon violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9.

### COUNT II

**(Against the Individual Defendants and MacAndrews for
Violations of § 20(a) of the Exchange Act)**

123.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

124.    For purposes of this claim, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging or sounding in fraud or intentional, knowing or reckless misconduct. Rather, the conduct alleged herein was negligent or grossly negligent.

125.    This claim is based solely upon the Offer Materials and SEC filings related to or incorporated by reference in the Offer Materials.

126.    The Individual Defendants and MacAndrews acted as controlling persons of Revlon within the meaning of § 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions as directors, officers, or controlling shareholders of the Company, and their participation in and/or awareness of Revlon financial results, operations and position in the markets in which it competes and/or knowledge of the status of its costs and expenses, inventory, sales and margin information, the Individual Defendants and MacAndrews had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Revlon, including the content and dissemination of the Offer Materials which plaintiff contends contain material omissions.  The Individual Defendants and MacAndrews were provided with or had unlimited access to copies of Revlon's Offer Materials alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

127.    In particular, the Individual Defendants and MacAndrews had direct and/or supervisory involvement in the operations of the Company and, therefore, are presumed to have had the power to control or influence the Offer Materials giving rise to the violations of § 14(a) of the Exchange Act and the Rules promulgated thereunder, as alleged herein, and exercised the same.

128.    As noted above, Revlon violated § 14(a) and Rule 14a-9 by their acts and omissions as alleged in this First Amended Complaint.  By virtue of its positions as controlling persons, the Individual Defendants and MacAndrews are liable pursuant to § 20(a) of the Exchange Act.

129.    As a direct and proximate result of the Individual Defendants' and MacAndrews' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their tender of the Company's Common Stock pursuant to the Offer Materials.

## COUNT III

### FOR INSIDER TRADING LIABILITY UNDER SECTION 20A OF THE EXCHANGE ACT

### (Against MacAndrews)

130.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

131.    The claims set forth herein are brought under Section 20A of the Exchange Act against MacAndrews in connection with its insider trading of Revlon Class A Common Stock.

132.    By virtue of MacAndrews' position, as controlling stockholder of Revlon, it had access to, and was in possession of material non-public information about Revlon at the time of its purchase through the Exchange Offer of over 9,336,905 shares of Revlon Class A Common Stock during the Class Period.

133.    By virtue of its position as controlling person and participation in Revlon's violations § 14(a) and Rule 14a-9 by their acts and omissions as alleged in this First Amended Complaint, MacAndrews is liable under § 20(a) of the Exchange Act and its applicable rules and regulations.

134.    MacAndrews knowingly or with deliberate recklessness purchased or caused to be purchased over 9,336,905 shares of Revlon Class A Common Stock during the Class Period while in possession of material, inside, non-public information.  Plaintiff and the Class tendered Revlon Class A Common Stock contemporaneous with MacAndrews' purchases.  Plaintiff Garofalo was the owner of 16,849 shares of Revlon Class A Common Stock and tendered his

Class A Common Stock into the Exchange Offer on October 8, 2009, contemporaneously with Defendant MacAndrews' purchase of all such tendered shares, including plaintiff Garofalo's.

135.    At the time of the sales of the securities by plaintiff and members of the Class, the value of the securities was substantially higher than the price received by plaintiff and members of the Class.

136.    All members of the Class who tendered shares of Revlon Class A Common Stock in the Exchange Offer pursuant to the Offer Materials contemporaneous with the purchase of Revlon Class A Common Stock by MacAndrews have suffered damages thereby.

**COUNT IV**

**BREACH OF FIDUCIARY DUTY**
**(Against Individual Defendants)**

137.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

138.    This count is brought under the doctrine of supplemental jurisdiction to enforce liability created under Delaware law.

139.    Individual Defendants have violated the fiduciary duties of care, loyalty, and good faith owed under Delaware law to the stockholders of Revlon.

140.    Given the timing of the Exchange Offer (which began just before the close of the Third Quarter 2009 and expired 9 days after the quarter ended), the Individual Defendants breached their fiduciary duties owed to plaintiff and other holders of the Company's Common Stock when they failed to fully and fairly disclose all material information within their control and closed the Exchange Offer without providing Revlon's minority stockholders with material information about the Third Quarter 2009. Given the confluence of a tender offer – an extraordinary transaction – and the end of the quarter, the Individual Defendants were paying

close attention to the financial results the Company would be announcing.   Certainly, that information was reasonably available to Individual Defendants by the October 7, 2009 close of the Exchange Offer.

141.   In failing to update the Exchange Offer so that Revlon's minority common stockholders could make a fully informed decision whether to exchange their Common Stock for Class A Preferred, the Individual Defendants failed to exercise the care required and breached their duties of loyalty, good faith and candor.

142.   The Individual Defendants controlled the corporate affairs of Revlon and were in possession of information concerning its assets, business, and future prospects.   There existed an imbalance and disparity of knowledge and information between them and the plaintiff and members of the Class.   Several of the Individual Defendants are not independent and stood to benefit from the non-disclosure of the information by virtue of their affiliation with MacAndrews.   It was inherently a breach of fiduciary duties to allow MacAndrews to consummate the Exchange Offer under these circumstances.

143.   Plaintiff and the Class have suffered irreparable injury because of the Individual Defendants' actions.

144.   Plaintiffs seek rescissory damages.   Without such relief, plaintiff and the other Class members will be excluded from their fair share of Revlon's profits, valuable assets and business.

## COUNT V

### BREACH OF FIDUCIARY DUTY AND AIDING AND ABETTING
(Against MacAndrews)

145.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

146.   MacAndrews had a fiduciary duty as controlling shareholder to the minority shareholders of Revlon such as plaintiff and members of the Class to act with candor. Separately, MacAndrews aided and abetted the Individual Defendants in their breaches of fiduciary duty.  It had access to the Revlon financial information which disclosure was required as material to the mix of information presented to plaintiff and the Class as part of the Exchange Offer.

147.   MacAndrews was aware of the Individual Defendants' failure to disclose the material information identified herein, and therefore had knowledge of the Individual Defendants' duties and their fiduciary breaches.

148.   Given that MacAndrews controlled Revlon and that two of MacAndrews' executives served as Revlon directors, MacAndrews was able to, and did, actively and knowingly encourage and participate in those breaches to obtain the substantial financial benefits that the Exchange Offer provided to it at the expense of Revlon's stockholders.

149.   As with the Individual Defendants, there was an imbalance and disparity of the knowledge and information possessed by MacAndrews by virtue of its position of control of Revlon between it and the plaintiff and members of the Class.  MacAndrews wrongfully sought to take advantage of the disparity and to induce the Class to relinquish their Common Stock in the Company at an unfair price on the basis of incomplete or inadequate information.

WHEREFORE, plaintiff prays for relief and judgment as follows:

A.   Declaring this to be a proper class action and certifying plaintiff as Class representative;

B.      Awarding compensatory damages in favor of plaintiff and the members of the Class against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding rescissory damages to the Class;

D.      Directing that Defendants account to plaintiff and the Class for all damages caused to them and account for all profits and any special benefits obtained by defendants as a result of their unlawful conduct;

E.      Awarding to plaintiff and the Class the costs and disbursements of this action, including a reasonable allowance for the fees and expenses of plaintiff's attorneys and experts; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: July 29, 2011

/s Robert D. Goldberg, Esq.
ROBERT D. GOLDBERG
Bar I.D. No. 631
BIGGS & BATTAGLIA
921 Orange Street
P.O. Box 1489
Wilmington, DE 19899
Tel.:   (302) 655-9677
Fax:    302) 655-7924
Email: goldberg@batlaw.com

LAWRENCE DEUTSCH
ROBIN SWITZENBAUM
GLEN L. ABRAMSON
SHAUNA ITRI
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA 19103
Tel:    (215) 875-3062
Fax:    (215) 875-4604
Email: ldeutsch@bm.net
        rswitzenbaum@bm.net

*Counsel for Plaintiff*

kal675317